[No. A130421. First Dist., Div. One. Nov. 30, 2011.]

THE PEOPLE, Plaintiff and Respondent, v.
ALEJANDRO RIVERA, Defendant and Appellant.

## COUNSEL

Stephen B. Bedrick, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, René A. Chacón and Luke Fadem, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**DONDERO, J.**—Defendant was convicted following a jury trial of first degree murder (Pen. Code, § 187), grand theft (Pen. Code, § 487, subd. (a)), first degree residential burglary (Pen. Code, § 459), and arson of an inhabited structure (Pen. Code, § 451, subd. (b)). In this appeal he claims that the trial court erred by admitting evidence of a reenactment of the homicide. We conclude that harmless error was committed, and affirm the judgment.

### STATEMENT OF FACTS

Defendant did not dispute that he killed the victim, Ted Neff, by strangling him in his three-level townhouse on Bustos Place in Bay Point on the night of

December 3, 2008, then set fire to his residence. The crucial issues at trial were defendant's intent associated with the homicide and the subsequent theft of items from the victim's residence.

Neff was gay and used craigslist to seek companionship and sexual relations. He was also an accomplished flautist, who owned a cherished solid gold Nagahara flute and a sterling silver flute.

Defendant advertised massage, escort and sexual services on craigslist. Neff contacted him, and in the middle of 2008 they began a sexual relationship that evolved into a friendship. Defendant visited Neff at his home regularly, often just to talk, eat dinner, or listen to Neff play the flute. On other occasions, Neff paid defendant for sexual encounters. At first, they used condoms, but they "trusted" each other, so thereafter they engaged in "unprotected sex."

Defendant testified that around 6:00 on the night of December 3, 2008, he appeared unexpectedly at Neff's residence for a visit. Neff was pleasantly surprised to see him. As they talked for a while in the living room, Neff told defendant about an "attempted break-in" the Sunday before, during which the "power switch" to the house was "pulled" to disconnect the electricity, and the front door was damaged. They watched a movie, then lit the fireplace logs on the second level of the residence. Smoke from the fireplace activated the fire alarm, which continued to ring loudly until defendant disconnected it on the third level.

After Neff left the house for 10 or 15 minutes, he returned and told defendant that he "had something very serious" to discuss. Neff said that "somebody he was seeing" in a "sexual way—had tested positive for HIV," and he may have "contracted the disease." He suggested that defendant get "checked out."

Upon hearing Neff's revelation defendant thought of his wife and son, and became enraged. Defendant testified that he felt upset and "betrayed." He "started wrestling" with Neff, threw him to the floor and began choking him. Neff implored defendant to "please stop it," but defendant was "on auto pilot," and "wasn't paying no mind to anything that was going on" other than choking the victim. Defendant stopped when he observed "a lot of saliva [and] some foamy stuff" coming from Neff's mouth. Defendant decided to leave. Neff was breathing, but defendant thought he was unconscious.

As defendant "headed towards the door to get out," he heard the phone ring. He looked at the "caller ID" feature on Neff's phone and discovered that the call was from the San Francisco "AIDS department." Defendant testified that he "hated" the victim "at that moment." Defendant realized Neff was still "grasping [*sic*] for air," so he took a "plastic strap" and choked him "until he couldn't breathe any more." He "didn't care" if Neff was dead.

When defendant was certain Neff was dead, he dragged the victim's body down to the first-level bedroom. Defendant then decided for "revenge" to take Neff's flutes, piccolos, and laptop computers, which he placed in a suitcase. Defendant became "paranoid," so he grabbed a book or magazine, lit it on fire, and threw it in the entertainment room. He wanted to destroy evidence of his presence in the house. Defendant then immediately left Neff's residence and drove straight home. However, within a few hours of killing Neff, defendant was back online soliciting a female customer to join him and his wife in a ménage-à-trois. Within a few days of the incident, defendant engaged in sex with his close friend Ernesto Molina. From the date of this homicide until his arrest, defendant never submitted to a medical test for HIV.

A neighbor reported the fire, and the Contra Costa County Fire Protection District responded to Neff's townhouse residence just before 10:00 p.m. The first level suffered fire damage, primarily in the "entertainment room," which was the point of origin of the fire started by an accelerant. Neff's body was discovered in a bedroom on the first level. A forensic pathologist concluded that Neff died from asphyxia due to hand and ligature strangulation, and was "dead at the time of the fire." The phone lines and fire alarms in the townhouse had been disconnected before the fire. Gas burners on the stove had been ignited.

The police investigation of Neff's murder focused on the theft of the solid gold Nagahara flute. The Contra Costa County Sheriff's Office was alerted by a flute dealer to defendant's attempt to sell the flute, and given his telephone number. The sheriff's department also discovered defendant's connection to the victim through a posting on his craigslist escort service Web site of a photograph of him in a shower with the same "distinctive tile work" as was observed in Neff's house. The phone number on the Web site advertisement matched the one of the man who attempted to sell Neff's Nagahara flute to the flute dealer.

On the evening of December 5, 2008, a homicide detective "made an undercover call" to defendant and deceptively arranged a meeting for a $140 "session" with him at the Crowne Plaza hotel in Concord. Defendant

subsequently appeared at the officer's hotel room and was detained. In his possession were condoms, toiletries, and the keys to his car. During a search of defendant's vehicle parked in the hotel parking lot the officers discovered the victim's two flutes, piccolos, laptop computers, and a suitcase that bore his initials.

Defendant was arrested and taken to the field operations bureau of the sheriff's department for a very lengthy interview. At first, defendant told the officers that the flutes found in his car trunk belonged to him, and explained that he had called a "flute specialist" to arrange a "tune-up" for the instruments. The officers thereafter informed defendant that the flutes were registered to Neff. Defendant then admitted that he was acquainted with Neff, and claimed he "broke in" and stole the flutes, laptops and a bag the Sunday before the victim's death. Defendant also acknowledged that Neff was his "client."

When presented with information that Neff's flutes and other items were not taken on the Sunday before the victim was killed, defendant briefly continued to deny that he was associated with Neff's death. He subsequently informed the officers that he was "gonna tell" them "what happened." Defendant admitted that he strangled Neff after the victim told him "he might have AIDS." Defendant said that he slapped Neff, pushed him "very hard" to the ground, and grabbed him around the neck until he noticed "saliva coming out of his mouth." Defendant's account of the killing of Neff given to the officers essentially paralleled his testimony at trial. Defendant told the officers that he did not "want to kill" or even "hurt" Neff, although he realized he "did a terrible thing to him."

## DISCUSSION

Defendant's sole contention is that the trial court erred by admitting demonstrative evidence in the nature of a courtroom reenactment of the strangling of the victim. During cross-examination of defendant, the prosecutor asked him to "show us how you killed" the victim. Defense counsel objected to "a demonstration," and the prosecutor indicated that he intended to portray the victim, and take defendant through the act of strangulation. The prosecutor argued that the proposed demonstration by defendant of "exactly what he did" was not "irrelevant or unduly prejudicial, pursuant to section 352," and had a "direct bearing on [the] central issue in this case, which is intent to kill." Defense counsel again objected to the absurd "theatrics," and concurred with the court that he was raising a "352 objection." Counsel

proposed that use of a mannequin would be "fine," and the court directed the prosecutor to "go find yourself a dummy."

When the prosecutor returned to court with a female mannequin wearing a blue dress, a pink ribbon, and a hat, defense counsel repeated a "352 objection to this thing that's in the courtroom." Counsel acknowledged his prior statement of accession to use of a mannequin, but pointed out that the female mannequin was "different" than the allegation of "strangling a man, a full-grown man." The court urged defense counsel to "disrobe her" and "take off the hat," the hair, and the pink ribbon. When that was done, defense counsel declared, "I still object, but that's better." The court denied defendant's request for a "402 hearing" on the matter, and declared that "we can just have him demonstrate to the extent he can" the strangulation of the victim. The prosecution proceeded to do just that. During the protracted demonstration, defendant was directed by the prosecutor and the court at different times, over his own objections and that of his counsel, to stand in certain positions, take a strap from a trash can in the district attorney's office, place the strap around the mannequin's neck, and apply force, as his acts were described for the jury. Basically, defendant was "led" by the court or prosecutor on what to do during the courtroom demonstration.

Defendant argues that evidence of the strangling demonstration had "virtually no probative value" to prove intent to kill or demonstrate the credibility of his testimony. He points out that the lack of "substantial similarity" between the "actual incident" and the "in court demonstration" distorted the jury's evaluation of his emotional state when the killing occurred, to the detriment of his heat of passion claim. Defendant also maintains that the context of the demonstration in the courtroom was inflammatory and prejudicial to the defense. The in-court presentation had the potential of shifting jury focus from the evening of the homicide towards the unscheduled and unanticipated but court-approved "reenactment" of the crime in the courtroom, complains defendant. He therefore maintains that the trial court abused its discretion under Evidence Code section 352 (section 352) by admitting demonstrative evidence that was more prejudicial than probative.

I. *The Claim of Lack of an Objection at Trial.*

 We first consider the Attorney General's claim that defendant forfeited the section 352 objection on appeal by failing to offer an objection on that ground in the trial court. We agree that a challenge to the admission of evidence must be made at trial or is considered forfeited on appeal. (See *People v. Jablonski* (2006) 37 Cal.4th 774, 823 [38 Cal.Rptr.3d 98, 126 P.3d

938]; *People v. Fauber* (1992) 2 Cal.4th 792, 831 [9 Cal.Rptr.2d 24, 831 P.2d 249].) "Under Evidence Code section 353, subdivision (a), a judgment can be reversed because of an erroneous admission of evidence only if the record contains an objection both ' "timely made and so stated as to make clear the specific ground of the objection" ' or motion. [Citation.] If a defendant fails to make a timely objection on the precise ground asserted on appeal, the error is not cognizable on appeal." (*People v. Polk* (2010) 190 Cal.App.4th 1183, 1194 [118 Cal.Rptr.3d 876]; see also *People v. Lewis* (2008) 43 Cal.4th 415, 503 [75 Cal.Rptr.3d 588, 181 P.3d 947].) " 'While no particular form of objection is required [citation], the objection must be made in such a way as to alert the trial court to the nature of the anticipated evidence and the basis on which exclusion is sought, and to afford the People an opportunity to establish its admissibility.' [Citation.]" (*People v. Holt* (1997) 15 Cal.4th 619, 666–667 [63 Cal.Rptr.2d 782, 937 P.2d 213]; see also *People v. Doolin* (2009) 45 Cal.4th 390, 438 [87 Cal.Rptr.3d 209, 198 P.3d 11].)

Defendant submits that his counsel properly offered a section 352 objection at trial. The record before us presents a rather puzzling sequence of events in which defense counsel offered a section 352 objection to a proposal to reenact the crime through simulated strangulation of the prosecutor by defendant, but seemed to assent to use of a mannequin instead. When the prosecutor subsequently presented a dressed female mannequin to be strangled by defendant, counsel explicitly reiterated a "352 objection" to the lack of similarity between the mannequin and alleged strangulation of Neff, "a full-grown man." The mannequin was disrobed, whereupon counsel again objected, but acknowledged that an undressed mannequin was "better" than one in women's clothing. The court then denied defendant's request for an Evidence Code section 402 hearing, and directed defendant to demonstrate on the mannequin the manner in which he dispatched Neff.

We are persuaded that defense counsel's series of objections, while perhaps not as detailed or precise as possible—understandable given the rather peculiar nature of the proffered evidence—was at least adequate to apprise both the trial court and the prosecution of the grounds for challenging the demonstrative evidence that are presented in this appeal. The essence of defendant's ultimate challenge to the evidence was that the proposed demonstration with the "mannequin of a woman was different" than the alleged murder and was prejudicial. In light of the prior explicit section 352 objections the court was fairly informed of the analysis required before admitting the evidence. (*People v. Partida* (2005) 37 Cal.4th 428, 439 [35 Cal.Rptr.3d 644, 122 P.3d 765].) And even if we found the defense objections lacking in the requisite precision, we would proceed to examine the propriety of the admission of the evidence to resolve defendant's associated claim of ineffective assistance of counsel (*People v. Valli* (2010) 187 Cal.App.4th 786,

802 [114 Cal.Rptr.3d 335]; *People v. Reyes* (2008) 165 Cal.App.4th 426, 433–434 [80 Cal.Rptr.3d 619].)

## II. *The Admission of the Demonstrative Evidence.*

■ We thus proceed to examine whether the probative value of the demonstrative evidence was " ' "substantially outweighed by the probability that its admission [would] . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)' [Citation.]" (*People v. Foster* (2010) 50 Cal.4th 1301, 1330 [117 Cal.Rptr.3d 658, 242 P.3d 105]; see also *People v. Thomas* (2011) 51 Cal.4th 449, 484 [121 Cal.Rptr.3d 521, 247 P.3d 886]; *People v. Michaels* (2002) 28 Cal.4th 486, 532 [122 Cal.Rptr.2d 285, 49 P.3d 1032].) ■ Evidence has probative value if it "ha[s] a 'tendency in reason to prove or disprove any disputed fact' [citation]." (*People v. Prince* (2007) 40 Cal.4th 1179, 1237 [57 Cal.Rptr.3d 543, 156 P.3d 1015].) " ' " 'Prejudice' as contemplated by [Evidence Code] section 352 is not so sweeping as to include any evidence the opponent finds inconvenient. Evidence is not prejudicial, as that term is used in a section 352 context, merely because it undermines the opponent's position or shores up that of the proponent. The ability to do so is what makes evidence relevant." ' " (*People v. Scott* (2011) 52 Cal.4th 452, 490 [129 Cal.Rptr.3d 91, 257 P.3d 703].) The prejudice referred to in section 352 is characterized as " ' "evidence that uniquely tends to evoke an emotional bias against a party as an individual, while having only slight probative value with regard to the issues." ' " (*People v. Carter* (2005) 36 Cal.4th 1114, 1168 [32 Cal.Rptr.3d 759, 117 P.3d 476].) " ' "The prejudice that section 352 ' "is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence." [Citations.] "Rather, the statute uses the word in its etymological sense of 'prejudging' a person or cause on the basis of extraneous factors. [Citation.]" [Citation.]' [Citation.] In other words, evidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction. In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose." [Citation.]' [Citation.]" (*People v. Scott, supra*, at p. 491.)

On appeal, we review the trial court's ruling on the admissibility of the evidence for abuse of discretion. (*People v. Thornton* (2007) 41 Cal.4th 391, 444–445 [61 Cal.Rptr.3d 461, 161 P.3d 3]; *People v. Pollock* (2004) 32 Cal.4th 1153, 1171 [13 Cal.Rptr.3d 34, 89 P.3d 353].) A trial court's decision to admit demonstrative evidence under section 352 will be upheld on appeal unless the

prejudicial effect of the evidence clearly outweighs its probative value. (*People v. Mills* (2010) 48 Cal.4th 158, 191–192 [106 Cal.Rptr.3d 153, 226 P.3d 276]; *People v. Moon* (2005) 37 Cal.4th 1, 34 [32 Cal.Rptr.3d 894, 117 P.3d 591].)

■ "Evidence of demonstration engaged in to test the truth of testimony that a certain thing occurred is admissible only where (1) the demonstration is relevant, (2) its conditions and those existing at the time of the alleged occurrence are shown to be substantially similar and (3) the evidence will not consume undue time or confuse or mislead the jury. [Citation.] The party offering the evidence bears the burden of showing that the foundational requirements have been satisfied." (*People v. Gilbert* (1992) 5 Cal.App.4th 1372, 1387–1388 [7 Cal.Rptr.2d 660].)

■ The probative value of evidence of the reenactment of a crime depends primarily on its similarity to the events and conditions that existed at the time of the crime. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1113 [36 Cal.Rptr.2d 235, 885 P.2d 1]; *People v. Boyd* (1990) 222 Cal.App.3d 541, 565–566 [271 Cal.Rptr. 738].) To be admissible, demonstrative evidence must satisfy two requirements: first the evidence must be a reasonable representation of that which it is alleged to portray; and second, the evidence must assist the jurors in their determination of the facts of the case, rather than serve to mislead them. (*People v. Jones* (2011) 51 Cal.4th 346, 375 [121 Cal.Rptr.3d 1, 247 P.3d 82]; *Rodrigues, supra,* at p. 1114.) Demonstrative evidence must accurately depict what it purports to show. (*People v. Mayfield* (1997) 14 Cal.4th 668, 747 [60 Cal.Rptr.2d 1, 928 P.2d 485].) The demonstration must be relevant to an issue in dispute "and 'must have been conducted under at least substantially similar, although not necessarily absolutely identical, conditions as those of the actual occurrence.' " (*People v. Pedroza* (2007) 147 Cal.App.4th 784, 795 [54 Cal.Rptr.3d 636], quoting *People v. Turner* (1994) 8 Cal.4th 137, 198 [32 Cal.Rptr.2d 762, 878 P.2d 521].) " 'Within these limits, " 'the physical conditions which existed at the time the event in question occurred need not be duplicated with precision nor is it required that no change has occurred between the happening of the event and the time' " ' " of the reenactment. (*People v. Carpenter* (1997) 15 Cal.4th 312, 386 [63 Cal.Rptr.2d 1, 935 P.2d 708], quoting *Rodrigues, supra,* at p. 1114.)

Here, the demonstrative evidence was offered to prove malice and "intent to kill" the victim. The Attorney General also suggests that the evidence was probative "to fill gaps" in defendant's testimony, particularly details of the strangling that defendant could not recall in his testimony.

Defendant admitted the killing and contested only the element of malice and, to a much lesser degree, intent to kill. His defense was that the killing

occurred as a result of heat of passion or unreasonable self-defense that reduced murder to manslaughter by negating the element of malice. (See *People v. Moye* (2009) 47 Cal.4th 537, 549 [98 Cal.Rptr.3d 113, 213 P.3d 652]; *People v. Johnston* (2003) 113 Cal.App.4th 1299, 1311 [7 Cal.Rptr.3d 161].)

Malice and intent to kill were convincingly established by defendant's testimony. Defendant acknowledged that after he discovered a call from the San Francisco "AIDS department," he "hated" Neff and strangled him a second time with a plastic strap until he was sure the victim could not breathe any longer. Defendant also testified that he realized Neff was dead, and "didn't care." Not only did defendant's verbal account of the killing convincingly disclose his specific intent to kill, but a physical reenactment of the strangulation added nothing to the proof of intent or malice. Nor did the demonstrative evidence contribute any insight into the credibility of defendant's testimony. The demonstration did not alter any inconsistencies in defendant's testimony or affect his lack of recollection of the particulars of the killing. Essentially, the strangulation demonstration was merely cumulative evidence that had exceedingly slight probative value on the crucial issues presented at trial. (*People v. Evers* (1992) 10 Cal.App.4th 588, 600 [12 Cal.Rptr.2d 637].)

The minimal probative value of the evidence was diminished further by the absence of similarity of both the setting and circumstances of the demonstration. A courtroom is hardly the appropriate venue to attempt to recreate and prove the manner of commission of a murder by strangulation. The setting was entirely dissimilar, lacking in the dimensions, configuration and the furniture that was present in the victim's home. Further, the use of a small, disrobed, wigless, lifeless female mannequin rendered the exhibition almost derisory, with the spectacle of defendant throttling a nonsentient, plastic entity that bore little physical likeness to the large male victim, all as orchestrated by the prosecutor. The acts of the victim were not reproduced. The emotion associated with the strangling, which was an integral part of the defense, was entirely missing from the demonstration. But for the seriousness of the charge, the courtroom events were suggestive of a slapstick parody. We recognize that the use of mannequins as illustrative evidence has been approved to assist the jury in understanding the testimony of witnesses or to clarify the circumstances of a crime, even if the evidence is cumulative. (See *People v. Williams* (1997) 16 Cal.4th 153, 214 [66 Cal.Rptr.2d 123, 940 P.2d 710] (*Williams*); *People v. Cummings* (1993) 4 Cal.4th 1233, 1291 [18 Cal.Rptr.2d 796, 850 P.2d 1] (*Cummings*).)[1] Here, however, the strangling of a mannequin by defendant was presented under conditions that were far from

---

[1] In *Williams* and *Cummings*, respectively, experts impaled mannequins with knitting needles and plastic dowels to demonstrate bullet trajectories.

substantially similar to the killing as described by his testimony, and was not demonstrative evidence that contributed to an understanding of the case by the jury. (*People v. Gonzalez* (2006) 38 Cal.4th 932, 952–953 [44 Cal.Rptr.3d 237, 135 P.3d 649]; *People v. Gilbert, supra*, 5 Cal.App.4th 1372, 1388.)

Turning to the prejudicial impact of the evidence, we find that a demonstration of the murder by defendant in court, before the jury, was inflammatory. It is one thing for the jury to hear a defendant's verbal account of a murder. Watching the defendant strangle a substitute for the victim is more likely to inflame the emotions of the jury and evoke an emotional bias, while having exceedingly negligible probative value, if any, on the issues.

We find that the prejudicial effect of the evidence, while not great, exceeded its comparatively inconsequential probative value. We therefore conclude that the trial court abused its discretion by admitting the strangling demonstration evidence.

### III. *The Error Was Not Prejudicial.*

■ We conclude that the error does not require reversal of the judgment. The governing standard is whether it is reasonably probable the jury would have reached a different result had the demonstrative evidence been excluded. (*People v. Carter, supra*, 36 Cal.4th 1114, 1170–1171; *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) Overwhelming evidence, including defendant's statement and testimony, proved that he intentionally strangled Neff, stole his flutes and computers, and set fire to his residence. The defense evidence offered to support the claims that defendant acted in unreasonable self-defense or under heat of passion, rather than with malice and specific intent to kill, was exceedingly weak. Not a hint of evidence suggested that defendant acted in response to a subjectively honest, if unreasonable, belief in the need to engage in lethal force to prevent imminent peril to life or serious injury at the hands of Neff. (*In re Christian S.* (1994) 7 Cal.4th 768, 783 [30 Cal.Rptr.2d 33, 872 P.2d 574]; *People v. Flannel* (1979) 25 Cal.3d 668, 674 [160 Cal.Rptr. 84, 603 P.2d 1]; *People v. Glenn* (1991) 229 Cal.App.3d 1461, 1467 [280 Cal.Rptr. 609]; *People v. Aris* (1989) 215 Cal.App.3d 1178, 1186 [264 Cal.Rptr. 167].)

■ As for the claim of a killing in the heat of passion, defendant was required to establish that he strangled the victim "without malice 'upon a sudden quarrel or heat of passion.' [Citations.] Under that theory, an unlawful killing is voluntary manslaughter ' "if the killer's reason was actually obscured as the result of a strong passion aroused by a 'provocation' sufficient

to cause an ' "ordinary [person] of average disposition . . . to act rashly or without due deliberation and reflection, and from this passion rather than judgment." ' " [Citation.]' [Citation.]" (*People v. Le* (2007) 158 Cal.App.4th 516, 527 [69 Cal.Rptr.3d 831]; see also *People v. Parras* (2007) 152 Cal.App.4th 219, 223 [60 Cal.Rptr.3d 850].) "[T]he heat of passion requirement for manslaughter has both an objective and a subjective component. [Citation.] The defendant must actually, subjectively, kill under the heat of passion. [Citation.] But the circumstances giving rise to the heat of passion are also viewed objectively." (*People v. Manriquez* (2005) 37 Cal.4th 547, 584 [36 Cal.Rptr.3d 340, 123 P.3d 614]; see also *People v. Avila* (2009) 46 Cal.4th 680, 705 [94 Cal.Rptr.3d 699, 208 P.3d 634]; *People v. Carasi* (2008) 44 Cal.4th 1263, 1306 [82 Cal.Rptr.3d 265, 190 P.3d 616].) " ' "[H]eat of passion must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances," because "no defendant may set up his own standard of conduct and justify or excuse himself because in fact his passions were aroused, unless further the jury believe that the facts and circumstances were sufficient to arouse the passions of the ordinarily reasonable man." [Citation.]' [Citation.]" *People v. Oropeza* (2007) 151 Cal.App.4th 73, 82–83 [59 Cal.Rptr.3d 653]; see also *People v. Kanawyer* (2003) 113 Cal.App.4th 1233, 1244 [7 Cal.Rptr.3d 401].)

Defendant's claim of heat of passion due to disclosure of Neff's HIV exposure was subject to serious dispute without the strangling demonstration, given his conduct in returning to attack the victim a second time, stealing the victim's property, setting fire to the residence, and failing to obtain HIV testing or refrain from subsequent sexual conduct. And even if his testimony was accepted by the jury, it did not establish adequate provocation to produce heat of passion in a reasonable person. In short, the evidence that defendant committed an act of first degree murder rather than voluntary manslaughter was overwhelming.

Finally, despite the rather absurd, indecorous courtroom spectacle of defendant strangling a female mannequin at the prompting of the prosecutor, we do not find that the demonstrative evidence was prejudicial to the defense. As we have noted, the strangling reenactment was merely a visual repetition of defendant's testimony. The demonstration was entirely cumulative, and did not in any way compromise his defense by introducing new inculpatory evidence of malice or intent. The evidence did not disclose to the jury any information that was not presented in detail through defendant's testimony and other evidence. (*People v. Cole* (2004) 33 Cal.4th 1158, 1199 [17 Cal.Rptr.3d 532, 95 P.3d 811].) While the strangling demonstration was inflammatory, we conclude it is not reasonably probable that the admission of the meaningless reenactment of the crime affected the jury's verdict in light

of the strong evidence of guilt. (*People v. Carter, supra,* 36 Cal.4th 1114, 1170–1171; *People v. Cole, supra,* at p. 1199; *People v. Boyette* (2002) 29 Cal.4th 381, 424 [127 Cal.Rptr.2d 544, 58 P.3d 391]; *People v. Hines* (1997) 15 Cal.4th 997, 1046 [64 Cal.Rptr.2d 594, 938 P.2d 388]; *People v. Evers, supra,* 10 Cal.App.4th 588, 600–601.)

Accordingly, the judgment is affirmed.

Marchiano, P. J., and Margulies, J., concurred.

Appellant's petition for review by the Supreme Court was denied February 22, 2012, S198644.