Filed 6/21/16  P. v. York CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>DANIEL ALAN YORK,<br><br>    Defendant and Appellant. | A143578<br><br>(Lake County<br>Super. Ct. No. CR933470) |

A jury convicted appellant Daniel Alan York of assault with a deadly weapon on a peace officer (Pen. Code, § 245, subd. (c) (Count 2)),[1] deterring an executive officer from performing a duty (§ 69 (Count 3)), hit-and-run driving with injury (Veh. Code, § 20001, subd. (a) (Count 4)), destruction of another's property (§ 594, subd. (a) (Count 5)), and vehicle theft with a prior conviction (§ 666.5, subd. (a) (Count 6)).  The court sentenced York to state prison.

York appeals.  He contends: (1) the court erred by admitting accident reconstruction photographs; (2) insufficient evidence supports the vehicle theft conviction; (3) the court erred by imposing consecutive sentences on Counts 4, 5, and 6 "rather than staying them[;]" and (4) this court should review the trial court's in camera proceedings to determine whether the court erred by failing to disclose additional material pursuant to *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*).

---

[1]    Unless noted, all further statutory references are to the Penal Code.

We have independently reviewed the sealed transcript of the in camera hearing conducted pursuant to *Pitchess* and conclude the court did not abuse its discretion in ordering disclosure of material from one law enforcement officer's personnel file. The Attorney General concedes the sentence imposed on Count 5 should be stayed, and we accept that concession and modify the judgment accordingly. As modified, we affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

The People charged York with attempted murder (§§ 664, 187, subd. (a) (Count 1)), assault with a deadly weapon on a peace officer (§ 245, subd. (c) Count 2)), deterring an executive officer from performing a duty (§ 69 (Count 3)), hit-and-run driving with injury (Veh. Code, § 20001, subd. (a) (Count 4)), destruction of another's property (§ 594, subd. (a) (Count 5)), vehicle theft with a prior conviction (§ 666.5, subd. (a) (Count 6)), and misdemeanor failure to register as a controlled substances offender (Health & Saf. Code, § 11594 (Count 7)). The information alleged several enhancements, including that York personally inflicted great bodily injury (§ 12022.7, subd. (a)).

*Prosecution Evidence*

At 4:30 a.m. on September 22, 2013, Clearlake Police Officer Michael Dietrick was driving a patrol car with Officer Thomas Riley. There was little traffic and the weather was clear. Officer Dietrick saw a black Chevy Tahoe with a broken taillight driving along Lakeshore Drive. As Officer Dietrick made a U-turn to initiate a traffic stop, the Tahoe sped away from the patrol car. Officer Dietrick accelerated and activated the patrol car's emergency lights as the Tahoe entered the parking lot of Redbud Park. The parking lot was well illuminated. The Tahoe drove around parked trucks and boat trailers "in an attempt to get away" from the patrol car. Eventually, the Tahoe came to a stop. Officer Dietrick stopped his patrol car about 20 feet from the Tahoe; the patrol car's lights were still flashing. A man was in the driver's seat of the Tahoe and the driver's side window was down.

A woman — later identified as Katherine Jackson — got out of the passenger side of the Tahoe and ran toward the park. Officer Riley left the patrol car and ran toward the

2

Tahoe, repeatedly yelling "'Stop. Stop the vehicle.'" As Officer Riley yelled, the man looked into the side-view mirror and shifted into reverse, even though the Tahoe had a "clear path to exit the parking lot by just moving forward." Officer Riley was behind the driver's side of the Tahoe.

The Tahoe's engine revved and its tires squealed as it "accelerated in reverse at a high rate of speed" and hit Officer Riley. Then the Tahoe collided with a pickup truck and drove out of the parking lot. Officer Dietrick saw Officer Riley on the ground, his back arched and his fists clenched. He appeared to be unconscious. His head was in a "pool of blood[.]" Officer Dietrick handcuffed Jackson and law enforcement officers found hypodermic syringes in her purse. Officer Riley had several cracked ribs, a large cut on his head, a black eye, abrasions on his legs and hands, and bruising all over his body.

Later that morning, police officers found the Tahoe in Clearlake, parked next to a tree. The Tahoe's "right front side . . . appeared to have struck the tree, and the rear end . . . had heavy damage." Clearlake Police Officers Michael Carpenter and Michael Ray and their police dogs went to a nearby house. Officer Carpenter and Sergeant Timothy Hobbs went to the front door, where Sergeant Hobbs spoke to a woman. At the back of the house, Officer Ray saw a man — later identified as York — on a ladder, "trying to leave the second story of the residence[.]" Officer Ray drew his weapon and ordered York to stop, but York retreated into the house. Sergeant Hobbs and Officer Carpenter entered the house and went upstairs, where they found York in a second-story bedroom. After Officer Carpenter's dog bit York, the officers arrested him.

Jackson met York in late September 2013. On the day after they met, York drove Jackson's Tahoe from San Francisco to Clearlake. As York drove Jackson home, he started to "act very weird." He began "rocking back and forth and mumbling . . . 'I'm going to run[.]'" Jackson asked, "'From who?'" and turned around and saw a police car's flashing lights. She told York to pull over, but he did not. Instead, he turned into a parking lot, saying "'I'm going to run. I'm going to run[.]'" When York finally stopped the car, Jackson got out and ran because she was "scared in the car." As she ran, she

looked back and saw the Tahoe running over Officer Riley. Jackson had given York permission to drive her home; she did not give him permission to "take off" with the Tahoe. As she ran from the Tahoe, Jackson did not say, "'Don't drive my car anymore'" because she thought "jumping out of the car and screaming [ ] would be enough" to convey to York that he did not have permission to drive her car.[2]

*Defense Evidence*

York had prior convictions for second degree burglary, automobile theft, assault, and possession of precursor chemicals to make methamphetamine. He was on parole. He had not reported to his parole officer for 10 months, and thought a warrant for his arrest had likely been issued. York described the incident. He denied seeing a police car; he also claimed he did not see any red or flashing lights. York did not tell Jackson he was going to run, and he denied seeing a person behind the Tahoe. York also claimed he was not capable of climbing a ladder. Officer Dietrick conceded it was "just seconds" from when the Tahoe stopped in the parking lot to when it accelerated backward.

*Verdict and Sentence*

The prosecution dismissed Count 1, Count 7, and one enhancement allegation. The jury convicted York of assault with a deadly weapon on a peace officer (§ 245, subd. (c) Count 2)), deterring an executive officer from performing a duty (§ 69 (Count 3)), hit-and-run driving with injury (Veh. Code, § 20001, subd. (a) (Count 4)), destruction of another's property (§ 594, subd. (a) (Count 5)), and vehicle theft with a prior conviction (§ 666.5, subd. (a) (Count 6)). The jury also determined York personally inflicted great bodily injury (§ 12022.7, subd. (a)). The court found various sentencing enhancement allegations true (§§ 667, 1170.12) and sentenced York to state prison.

---

[2]    At the conclusion of the prosecution's case-in-chief, York moved for acquittal (§ 1118.1) on the vehicle theft charge, claiming Jackson's permission allowing York to drive the car "goes forever[.]" The court denied the motion, concluding the jury had "sufficient evidence . . . to decide that at the time [York] left the parking lot in such a hurry, that he no longer had permission to take the vehicle away from her, especially since she was no longer in [it]."

4

# DISCUSSION

## I.

### *Admitting the Accident Reconstruction Photographs*
### *Was Not an Abuse of Discretion*

York claims the court erred by admitting photographs taken during an accident reconstruction because they "did not accurately reflect the incident" and were "prejudicial."

A.     The Accident Reconstruction

A few days after the incident, Clearlake Police Officer Trevor Franklin and Detective Ryan Peterson returned to the parking lot to reconstruct the incident. The reconstruction was videotaped; Detective Peterson and a prosecution investigator took photographs with a digital camera. Detective Peterson — who was approximately the same height as York —used a slightly newer Tahoe in the reconstruction. He positioned the Tahoe, the driver's seat, and the mirrors like the Tahoe York drove. A police officer stood behind the Tahoe, visible in the Tahoe's rear view mirror. Detective Peterson also positioned a patrol car by referencing "paint markings" placed by crime scene and traffic collision investigators. The lighting during the reconstruction mimicked the lighting during the incident, except that the patrol vehicle's emergency lights and passenger side spotlight were off because the glare "obstruct[ed] the photograph[s]."

Before trial, York moved in limine to exclude the accident reconstruction video. York also objected to the photographs, claiming they were prejudicial and inaccurate. The court excluded the video, but admitted the photographs. It explained: "it's important to show the lighting conditions. The offer of proof is that those stills were taken during the same lighting conditions. And I guess Officers Dietrick and/or Franklin will corroborate that. Of course if they don't, then those photos are not coming in. But assuming they do, I'm going to allow them in, including those that show an officer in a side-view mirror. There may be just some dispute whether he's standing too close or too far back, but the defense is entitled to cross-examine and put their own evidence on to that extent. They think that's accurate. You think it's not. That's what trials are for. So

5

you both get to put that evidence on and you two can argue about it, how accurate that is and how much weight the jury should give it. . . . I'm going to allow the stills assuming the foundation . . . as represented is made." Several officers testified about the accident reconstruction and the photographs.

B.     The Court Did Not Err by Admitting the Accident Reconstruction Photographs

York claims the court abused its discretion by admitting the photographs because they "were not sufficiently similar to the incident" and were more prejudicial than probative under Evidence Code section 352. "'Evidence of demonstration engaged in to test the truth of testimony that a certain thing occurred is admissible only where (1) the demonstration is relevant, (2) its conditions and those existing at the time of the alleged occurrence are shown to be substantially similar and (3) the evidence will not consume undue time or confuse or mislead the jury. [Citation.] The party offering the evidence bears the burden of showing that the foundational requirements have been satisfied.' [Citation.] [¶] The probative value of evidence of the reenactment of a crime depends primarily on its similarity to the events and conditions that existed at the time of the crime. [Citations]." (*People v. Rivera* (2011) 201 Cal.App.4th 353, 363 (*Rivera*).)

"To be admissible, demonstrative evidence must . . . accurately depict what it purports to show. [Citation.] The demonstration . . . ' . . . "must have been conducted under at least substantially similar, although not necessarily absolutely identical, conditions as those of the actual occurrence.'" [Citations.] "'Within these limits, "'the physical conditions which existed at the time the event in question occurred need not be duplicated with precision nor is it required that no change has occurred between the happening of the event and the time"'"' of the reenactment. [Citations.]" (*Rivera, supra,* 201 Cal.App.4th at p. 363.) "On appeal, we review the trial court's ruling on the admissibility of the evidence for abuse of discretion. [Citations.]" (*Id.* at p. 362.)

York concedes the photographs were relevant, but claims they were insufficiently similar "to the actual event." To support this argument, York relies on several cases, including *People v. Vaiza* (1966) 244 Cal.App.2d 121 (*Vaiza*). In that case, the trial court

6

admitted four pictures "designed to show lighting conditions at the scene of the crime. The photographs were taken at approximately 7:30 [ ] in the evening many months after the event, whereas the lighting conditions . . . at the time of the alleged crime were those . . . at 2 o'clock" in the morning. (*Id.* at pp. 126-127.) The *Vaiza* court determined the prosecution did not establish the pictures were "taken at the same hour of the morning as the incident" and, as a result, the trial court erred by admitting them. (*Id.* at p. 127.)

*Vaiza* is distinguishable. Here, York concedes the photographs were not taken solely to show the lighting conditions on the day of the incident, but also to establish York could see Officer Riley in the side-view mirror as he reversed the Tahoe at a high rate of speed. Unlike *Vaiza*, the prosecution established the accident reconstruction pictures were taken at the same time as the incident, and under substantially similar lighting conditions. The prosecution was not required to show "the conditions were absolutely identical" (*People v. Boyd* (1990) 222 Cal.App.3d 541, 565) and the fact that the pictures featured a police officer standing behind the Tahoe, not running, does not render the photographs insufficiently similar to the incident. We conclude the court properly admitted the photographs. (See *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1114-1115, fn. omitted [trial court properly concluded videotape showing relative locations of buildings at the crime scene was "a reasonable representation of the physical layout" and would "aid the jurors . . . notwithstanding the claimed inaccuracies"]; *Greeneich v. Southern Pac. Co.* (1961) 189 Cal.App.2d 100, 107-108 [court properly admitted movie despite dissimilar lighting and other conditions].)

York also claims the admission of the photographs violated Evidence Code section 352. We disagree. "'The prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence.' [Citations.]" (*People v. Zapien* (1993) 4 Cal.4th 929, 958.) Rather, evidence is unduly prejudicial under section 352 *only* "'"'when it uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues.'"' [Citations.]" (*People v. Barnett* (1998) 17 Cal.4th 1044, 1118-1119.) Here, the pictures showed a police officer

7

visible in the Tahoe's side-view mirror.  This undoubtedly was damaging to York, but not prejudicial in the sense that it evoked an emotional bias against him.  (*People v. Rodrigues, supra,* 8 Cal.4th at p. 1115 [photographs not unduly prejudicial under Evidence Code section 352]; *cf. Rivera, supra,* 201 Cal.App.4th at p. 365 [courtroom reenactment of strangulation unduly prejudicial; it was "likely to inflame the emotions of the jury and evoke an emotional bias, while having exceedingly negligible probative value"].)  Moreover, the pictures were far less inflammatory than Officer Dietrick's testimony that the Tahoe ran over Officer Riley at a high rate of speed, and his gruesome description of Officer Riley's injuries.

Having concluded the court properly admitted the accident reconstruction photographs, we need not consider York's claim that the admission of the evidence violated his federal due process rights, nor the Attorney General's harmless error argument.

## II.

### *Sufficient Evidence Supports the Vehicle Theft Conviction*

York contends his conviction for vehicle theft with a prior conviction (§ 666.5 (Count 6)) must be reversed because the prosecution did not establish he drove Jackson's car without her consent.  "[N]onconsent of the owner is a necessary element of the crime of the unlawful taking or driving of a vehicle."  (*People v. Lam* (2004) 122 Cal.App.4th 1297, 1301.)  "The specific intent to deprive the owner of possession of [her] vehicle '"may be inferred from all the facts and circumstances of the particular case."' [Citation.]"  (*People v. O'Dell* (2007) 153 Cal.App.4th 1569, 1577.)

York "bears a massive burden in claiming insufficient evidence to sustain his conviction[ ] because our role on appeal is a limited one. [¶] Our standard of review is to 'examine the entire record in the light most favorable to the prosecution, presuming in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' [Citations.]"  (*People v. Akins* (1997) 56 Cal.App.4th 331, 336.)  York cannot satisfy his "massive burden[.]"  (*Id.* at p. 336.)  At trial, Jackson testified she allowed York to drive her home in the Tahoe, but she did not give York permission to

"take off" with the car, nor to run over Officer Riley. Jackson also testified she thought "jumping out of the car and screaming [ ] would be enough" to convey that York did not have permission to drive her car. This evidence is sufficient to support the vehicle theft conviction. (*People v. O'Dell, supra,* 153 Cal.App.4th at p. 1577 [evidence created rational inference the defendant knew the truck he drove was stolen]; *People v. Hutchings* (1966) 242 Cal.App.2d 294, 295 [sufficient evidence supported conviction where the defendant drove "the car far beyond the scope of the original consent"].)

III.

*Count 5 Must be Stayed*

As stated above, the jury convicted York of assault with a deadly weapon on a peace officer (§ 245, subd. (c) (Count 2)), deterring an executive officer from performing a duty (§ 69 (Count 3)), hit-and-run driving with injury (Veh. Code, § 20001, subd. (a) (Count 4)), destruction of another's property (§ 594, subd. (a) (Count 5)), and vehicle theft with a prior conviction (§ 666.5, subd. (a) (Count 6)). The court designated Count 2 as the principal term and stayed the term on Count 3 pursuant to section 654, concluding the two counts shared "the same operative facts. . . . His resisting was through assaulting the officer." The court imposed the term for Count 4 to run consecutive to the term for Count 2. On Counts 5 and 6, the court imposed terms to run concurrently to each other, but consecutive to the term for Count 2.

York argues "the court erred by imposing consecutive terms on Counts 4, 5, and 6 rather than staying them" under section 654. According to York, the acts of striking Officer Riley (Count 2), damaging the Tahoe (Count 5), and driving away in the Tahoe after hitting Riley (Count 4) and stealing the Tahoe (Count 6), were part of a "single, indivisible transaction which occurred within a matter of seconds, and all with a single objective: to flee the scene" and avoid being apprehended by the police.[3] The Attorney

---

3    York's failure to raise the issue in the trial court does not waive the issue on appeal. "When a court imposes multiple punishments in violation of section 654, it acts in excess of its jurisdiction and imposes an unauthorized sentence that can be challenged

General concedes the term on Count 5 should be stayed, but contends the court was not required to stay Counts 4 and 6. We agree.

Section 654, subdivision (a) provides: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." The statute "prohibits punishment for two crimes arising from a single indivisible course of conduct. [Citation.] If all of the crimes were merely incidental to, or were the means of accomplishing or facilitating one objective, a defendant may be punished only once. [Citation.] If, however, a defendant had several independent criminal objectives, he may be punished for each crime committed in pursuit of each objective, even though the crimes shared common acts or were parts of an otherwise indivisible course of conduct. [Citation.] The defendant's intent and objective are factual questions for the trial court, and we will uphold its ruling on these matters if . . . supported by substantial evidence." (*People v. Perry* (2007) 154 Cal.App.4th 1521, 1525; see also *People v. Chung* (2015) 237 Cal.App.4th 462, 468 [noting recent California Supreme Court decisions regarding section 654 did not overrule the "'intent and objective' test"].) Where — as here — the court imposes consecutive sentences, it impliedly finds the defendant entertained multiple criminal objectives and we must determine whether substantial evidence supports that finding. (*People v. Gaio* (2000) 81 Cal.App.4th 919, 935.)

We are not persuaded by York's claim that "all the acts underlying counts 2 through 6 were incident to a single" objective. Substantial evidence supports the court's implicit finding that York harbored one objective in assaulting Officer Riley (Count 2) by reversing the Tahoe into him at a high rate of speed, and a different objective in leaving the scene of the accident (Count 4). York cites no authority supporting "the proposition that hit and run sentences *must* be stayed upon sentencing for the underlying injury" and at least one court has held otherwise. (See *People v. Butler* (1986) 184 Cal.App.3d 469,

for the first time on appeal. [Citation.]" (*People v. Soto* (2016) 245 Cal.App.4th 1219, 1234; *People v. Hester* (2000) 22 Cal.4th 290, 295.)

10

473-474 [defendant harbored different objectives in negligently driving a vehicle under the influence of alcohol and causing an accident, and then intentionally leaving the scene of the accident].)  Substantial evidence also supports the court's implicit finding that York harbored one objective in assaulting Officer Riley (Count 2) and a different objective in stealing the Tahoe (Count 6).

York contends he had a single objective in hit-and-run driving with injury (Count 4) and stealing the Tahoe (Count 6): "to escape the accident scene."  We disagree.  At trial, Jackson testified that when York finally stopped the Tahoe in the parking lot, she got out and ran.  Jackson had given York permission to drive her home, but not to "take off" with the Tahoe.  Considering — as we must — this evidence in the light most favorable to the Attorney General, we conclude the trial court could have reasonably determined York's intent and objective in stealing the car was to deprive York of possession and his objective in fleeing after injuring Officer Riley was to avoid being apprehended for the assault.  (Cf. *People v. Bauer* (1969) 1 Cal.3d 368, 377-378 [taking a car during commission of a robbery for purposes of facilitating escape constitutes indivisible course of conduct justifying single punishment].)

The Attorney General concedes York's sentence on Count 5, for destruction of another's property (§ 594, subd. (a)), must be stayed pursuant to section 654 because the damage to the Tahoe occurred when York was accelerating backward with the intent to strike Officer Riley (Count 2).  We accept the concession.  The judgment is modified to stay the sentence on Count 5.

IV.

*There is No Pitchess Error*

Before trial, York filed a *Pitchess* motion for disclosure of the personnel records of Officers Carpenter, Dietrick, Ray, Riley, and Christopher Reagan.  York also sought the personnel records of Sergeant Hobbs and Detectives Peterson and Travis Lenz.  The People opposed the motion.  The court found good cause to hold a *Pitchess* hearing as to Officers Carpenter, Dietrick, and Detectives Peterson and Lenz, and conducted an in

11

camera review of those officers' personnel files.  The court ordered disclosure for one officer.

York asks us to conduct an independent review of the trial court's in camera proceedings held pursuant to *Pitchess* to determine whether the court erred by withholding discoverable personnel records.  The People do not oppose the request.  We have reviewed the sealed transcript of the in camera review, in which the court "state[d] for the record what documents it examined." (*People v. Mooc* (2001) 26 Cal.4th 1216, 1229.)  We conclude the court did not abuse its discretion in ordering disclosure of material from one law enforcement officer's personnel file.  (*People v. Myles* (2012) 53 Cal.4th 1181, 1209; *People v. Prince* (2007) 40 Cal.4th 1179, 1285-1286.)

DISPOSITION

The judgment is modified by staying execution of the term for destruction of another's property (§ 594, subd. (a) (Count 5)).  The trial court is directed to prepare an amended abstract of judgment reflecting the modification, and any other modifications necessary for the abstract of judgment to conform with the court's oral pronouncement of sentence, and to forward the amended abstract of judgment to the Department of Corrections and Rehabilitation.  As modified, the judgment is affirmed.

_____

Jones, P.J.

We concur:


_____

Simons, J.


_____

Bruiniers, J.

12