Filed 10/5/20  P. v. Herrera CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOUTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>EDUARDO HERRERA,<br><br>    Defendant and Appellant. | D075202<br><br>(Super. Ct. No. SCN366832)<br><br>ORDER MODIFYING OPINION AND DENYING PETITION FOR HEARING<br><br>NO CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the opinion filed herein on September 15, 2020, be modified as follows:

1.  On page 41 of the opinion, the first full paragraph is deleted and replaced with the following paragraph:

> Defendant next contends the court prejudicially erred in admitting over objection a two-minute long video demonstration of law enforcement firing the same type of gun defendant used in committing certain of the offenses.  According to the prosecutor, the video (which was included in the appellate record, and which we have reviewed) showed officers firing the gun into a vehicle.  The prosecutor argued the video was probative as it showed how the gun was fired and expended cartridge cases, and its power.

There is no change in judgment.

The petition of rehearing is denied.

BENKE, Acting P. J.

Copies to:  All parties

2

Filed 9/15/20 P. v. Herrera CA4/1 (unmodified opinion)
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOUTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D075202 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCN366832) |
| EDUARDO HERRERA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, David G. Brown, Judge. Affirmed in part, reversed in part.

Jill M. Klein, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and Allison V. Acosta, Deputy Attorneys General, for Plaintiff and Respondent.

An information charged defendant Eduardo Herrera with attempted willful, deliberate, and premeditated murder (Pen. Code,[1] §§ 187, subd. (a) & 664, counts 1 & 2); assault with a semiautomatic firearm (§ 245, subd (b),

___

[1] All further statutory references are to the Penal Code unless noted otherwise.

counts 3 & 4); assault with a deadly weapon other than a firearm (§ 245, subd. (a)(1), count 5); carrying a loaded firearm on a person or in a vehicle (§ 25850, subd. (a), count 6); and possessing a firearm as a felon (§ 29800, subd. (a)(1), count 7). The information further alleged defendant personally used a firearm (§ 12022.5, subd. (a), counts 1, 2, 3, and 4); intentionally and personally discharged a firearm (§ 12022.53, subd. (c), counts 1 and 2); personally used a dangerous and deadly weapon (§ 1192.7, subd. (c)(23), count 5); and had five prison priors (§§ 667.5, subd. (b) & 668).

The jury convicted defendant—who was self-represented for about eight months before, and during, trial—on all counts and returned true findings on all allegations. Defendant, in a bifurcated proceeding, admitted the truth of all prior prison allegations. The court sentenced defendant to prison for the indeterminate term of 14 years to life plus the determinate sentence of 59 years eight months.

Defendant on appeal contends: 1) that the court abused its discretion when, immediately before commencement of his continued preliminary hearing, it denied his request for reappointment of counsel; 2) that law enforcement/the prosecution failed to preserve his car as exculpatory evidence, and the court erred by refusing to instruct the jury it could draw an adverse inference as a result; 3) that the court erred in (i) refusing to instruct the jury on attempted voluntary manslaughter based on imperfect self-defense, (ii) instructing the jury it could consider defendant's prior felony conviction(s) in assessing credibility on all counts, and (iii) admitting a two-minute video demonstration of law enforcement firing the same type of gun defendant had used in committing the offenses; 4) that the court abused its discretion in admitting evidence defendant had two knives in his car at the time he committed the offenses; 5) that the evidence was insufficient to

support his conviction on count 5, assault with a deadly weapon other than a firearm; and 6) that his prior prison term enhancements should be stricken.

As we explain, we conclude defendant's prior prison enhancements should be stricken, as the People concede. In all other respects, we affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND[2]

Freddy M. testified he and partner Conrado P. were working for a trucking company delivering appliances on November 25, 2016. Freddy testified they made deliveries in a 26-foot white "box" truck; their day had started at about 6:30 a.m. and he was the driver; and that they had made about 15-17 deliveries when they arrived at about 4:45 p.m. at the 900 block of North Fig Street in Escondido to make their next delivery.

The delivery to the North Fig resident required them to pass through a security gate. Freddy recalled they parked the truck in front of an apartment complex while they waited about five or 10 minutes for the resident to open the gate. As they sat waiting in the truck, Freddy saw a green Chevy Lumina approach. Freddy identified defendant, who was alone in the car, as the driver of the Chevy. The driver "put on his brakes," "honked his horn," and used his left hand to make what Freddy considered was an unfriendly gesture.

Freddy and Conrado conferred as they sat in the truck, and found neither knew the Chevy driver. Freddy testified the car was about 13 feet away from the truck when the driver stopped, with the "confrontation" lasting about five seconds. They let the driver pass as they just wanted to finish their delivery.

---

[2]    We summarize the evidence in the light most favorable to the judgment. (See *People v. Osband* (1996) 13 Cal.4th 622, 690.)

Freddy and Conrado delivered the appliance, which Freddy estimated took about 20 minutes. They left the apartment complex and headed southbound on Fig toward their next delivery. As Freddy waited at the stoplight at the intersection of Mission Avenue and Fig, he heard the sound of a car "revving" its engine, looked in his truck mirror, and saw the same Chevy accelerating toward them. Freddy then felt a "jolt," as the Chevy struck the "stairs" and "ladder" under the truck's driver's side door.

Freddy looked out his window and saw the Chevy driver leaning out of the window of the passenger side of the car, inexplicably pointing a gun at Freddy. The driver then began firing the weapon. Immediately before the gunfire erupted, Freddy "threw" himself to the right and yelled "get down" to Conrado. Freddy estimated the driver fired four or five shots at them.

Freddy quickly turned onto Mission Avenue and began accelerating. As he fled, Freddy looked in the truck mirror and saw the Chevy following them. The Chevy accelerated and again struck the truck. Freddy testified the driver then fired about four or five additional shots at the truck, as Freddy saw "smoke" coming from the gun.[3] As he drove down Mission Avenue, Freddy estimated the Chevy struck the truck about "seven times."

Freddy next turned onto Broadway. The Chevy followed. Freddy maneuvered the truck to prevent the car from passing, as Freddy was concerned about people walking outside and the rush-hour traffic. Freddy next turned onto East Lincoln Parkway. As the chase continued, Conrado was on the phone with a 911 dispatcher. Freddy next turned and headed southbound on Fig, the same street where they had made the delivery. Once on Fig, the driver of the Chevy again tried to "ram" his car into the truck.

---

3    As discussed *post*, defendant denied discharging his weapon a second time.

Freddy turned onto East Washington Avenue. The Chevy gave chase. Freddy saw a patrol car up ahead. Freddy accelerated as the car again veered into the truck. This time, however, the Chevy's front tire became "stuck" on the truck's ramp, causing the truck to "drag[]" the car down the street, with the police car in pursuit. Freddy dislodged the Chevy by moving the truck's steering wheel back and forth.

Shortly thereafter, Freddy saw "a lot of police cars" as he came to a stop. Once the "dust settled," Freddy walked around the truck to survey the damage. Freddy counted five bullet holes on his side of the truck.

Conrado confirmed that he and Freddy were delivering appliances on November 25. While sitting in the truck waiting to make a delivery in Escondido, Conrado saw a car approaching from the other direction. Conrado identified the car's driver as defendant, who was alone in the car, and the car as a Chevy Lumina. The Chevy driver stopped his car about 10 feet from the truck, honked his horn, and made a "mad-dogging mean face." Conrado and Freddy "looked at each other," and watched the car pass.

Conrado estimated it took about 15 or 20 minutes to deliver the appliance. Once back in the truck, the men headed to their next delivery. As they waited at a stoplight, Freddy suddenly yelled for Conrado to "duck," then Conrado heard about four or five gunshots and felt the "impact" of the bullets hitting the truck. Freddy accelerated while Conrado called 911. As the truck went down one street, Conrado felt a car strike the driver side of the truck about four times. Conrado looked out the passenger side mirror and saw it was the same car and driver that had confronted them before the delivery.

Conrado testified that after Freddy turned onto East Washington Avenue, they saw a patrol car up ahead. The Chevy driver, however,

continued to swerve toward and strike the truck, which Conrado estimated occurred two or three more times until the front right front side of the car became "stuck" in the truck's driver's side rear wheel. At some point, the car dislodged from the truck, after Freddy moved the steering wheel back and forth.

Freddy stopped the truck at the intersection of North Broadway and East Washington. Multiple police officers with guns drawn approached the truck. After officers secured the scene and interviewed Conrado, he identified defendant at a street lineup as the Chevy driver.

Escondido police officer Raymond Solorio was on duty on November 25 when at 5:21 p.m. he responded to Conrado's 911 call. While stopped at the intersection of East Washington Avenue and North Fig Street, Officer Solorio saw a truck and a Chevy "side by side" "come around the corner and almost strike [his] patrol vehicle." Officer Solorio made a U-turn and activated his "emergency lights."

Officer Solorio saw the Chevy veer "left, away from the truck, and then went right back into the box truck and [get] stuck" in the truck's "tire well." Officer Solorio estimated the truck dragged the Chevy about 75 to 100 yards down the street. After the Chevy dislodged, the truck kept going.

Officer Solorio saw the driver of the Chevy, whom the officer identified as defendant, "jump[] out of his car" while it was still moving and flag down the officer. Officer Solorio knew defendant from previous contacts, including instances when defendant had been under the influence of methamphetamine. Officer Solorio watched the Chevy "jump[] over the sidewalk, and then hit a white fence on the north curb line," finally coming to a stop.

6

Officer Solorio testified defendant, on contact, was "frantic," claiming "his family was in the box truck and they needed help." Officer Solorio activated his body camera, which video was shown to the jury. Officer Solorio looked inside the Chevy and saw in plain view on the driver's side floorboard a "silver semi-automatic handgun, .45 caliber. The slide was locked to the back, so there was no bullet in the chamber, but the magazine well was inside." Officer Solorio also observed inside the car a .45 caliber bullet casing on the driver's side seat, and two knives.

A transcript of the video from Officer Solorio's camera was included in the record. It shows that on contact, defendant was agitated; that defendant believed his family was inside the truck, and were being held against their will; that he also believed the truck's occupants had been "taking people, like [defendant's] kids"; and that he claimed the truck had been following him, and not vice-versa.

Escondido police officer Thomas Fidel, who assisted Officer Solorio, also recognized defendant from previous contacts. Officer Fidel activated his body camera. The transcript from the recording shows that defendant believed the white truck and maybe two other cars had begun following him in El Cajon; that "somebody . . . threw a gun at [defendant]" and so he "just picked it up and . . . threw it—threw it in the car"; that he heard four or five gunshots, but then did not claim to be the shooter; and that he told the officers he "hope[d]" the individuals in the truck "didn't do anything to [his] kids."

At defendant's repeated urging, the officers looked for defendant's wallet inside the Chevy. As they did so, defendant volunteered, "Hey, there's a bladed knife there too. That I kind of, you know, I ended up—I ended up finding." Defendant then stated he "found" the knife at his "mom's house," and kept it because he wanted it tested for "DNA," as he believed there was

7

"human" blood on the blade. Defendant also told officers he was worried about his mother, because the white truck had exited near his "mom's place"; and the truck had "picked up either [his] kids or they picked up one of [his] family members, like [his] brother's kids."

Also during the contact, defendant began talking about a boy's body. He volunteered, "Hey, so look, like yesterday I seen somebody—somebody take a body of a boy." Defendant indicated the boy's body had been picked up "at night," the boy was "dead," and the dead boy "reminded [defendant] of [his] son, and [he] thought it was [his] son." Defendant went on to explain that there was a "difference between dead weight," and "somebody sleeping"; that a truck had picked up the dead boy near defendant's home on Fig; and that the truck which picked up the boy was similar to the white truck that defendant claimed had been following him.

Defendant also told Officer Fidel that defendant's "babies' momma" had a restraining order against him and that it had been "three or four years" since he had last seen his children. Defendant also expressed concern his family was being "target[ed]" by a "satanical cult," or a "pedophile group type of thing."

As the contact continued, an officer asked defendant if a woman who was approaching was his sister, as she claimed. Defendant said no, then told officers not to listen to her. When asked what the woman would say, defendant responded, "Like that—that I'm on drugs, and I'm tripping. That fucken uh, that—yeah, fuck that." Defendant then admitted the woman was his sister. Defendant's sister tried to reassure him that his kids were "good" and "fine." Officer Fidel told another officer at the scene that defendant was "11-5" and wanted to speak to a detective because defendant no longer trusted the officers.

8

At trial, Officer Fidel testified his "11-5" reference during the contact was to methamphetamine and was short for section 11550 of the Health and Safety Code. Officer Fidel opined that defendant was under the influence of methamphetamine during the November 25 contact; that defendant nonetheless was able to follow commands and communicate with the officers, including providing his name and date of birth; but that defendant "seemed delusional and somewhat paranoid," as defendant had insisted during the contact that someone was also trying to "frame" him. Officer Fidel confirmed that, as a result of defendant's concerns about his mother and his reference to the bloody knife, other officers had conducted a welfare check on defendant's mother and had found she was "okay."

A few minutes after the shooting, Escondido police conducted a "sweeping search" of the area near the "highly trafficked" intersection of "Fig and Mission" where the shooting occurred. Police found in the area an expended casing, stamped "Winchester .45 auto," and two expended projectiles.

Escondido police also examined the exterior of the white truck. Police confirmed there were five bullet holes to the driver's side of the truck, which were consistent with "projectiles being fired from a handgun." Inside the truck, police found an expended projectile on the driver's side floorboard, and another in the driver's door, after the door panel had been removed.

A San Diego County Sheriff's Department criminalist identified the semiautomatic gun recovered in defendant's car as a .45 Colt Defender series 90. The criminalist testified that the magazine for defendant's gun held up to seven .45 auto-caliber cartridges; that if a cartridge had been preloaded into the chamber of the gun, it had the capacity to fire a total of eight cartridges; that defendant's gun was operational; and that after test-firing the gun and

9

comparing the expended test-fired cartridge to the two cartridges recovered by police at the intersection, it was determined that all three cartridges were fired from the same gun.

Margie B. testified she was heading south on North Fig Street at about 5:20 p.m. on November 25 when a fast-moving white truck pulled in front of her from the left side of the street. Immediately thereafter, a green Chevy came speeding past her right side, between her car and the curb. Margie saw the Chevy accelerate, move into the left turn lane, and stop next to the left side of the white truck, which had stopped at a traffic signal.

Margie next saw the driver's side door of the Chevy "slam[] open," the driver "step[] out of the car and reach[] over the roof with both arms and [shoot a] gun two, three times into the truck." Margie saw the Chevy driver was "right across from the driver's door" of the truck when he fired the gun, "using the roof of the Chevy . . . as a base of support." Although "freaking out," Margie attempted to memorize the license plate number of the Chevy. Margie saw the truck turn onto Mission Avenue, as she searched for her cellphone to call 911.

Defendant testified in his defense. The night before the shooting, while staying at his mother's home in Escondido, defendant admitted using methamphetamine and staying up for the night. At about 3:00 a.m., while outside smoking a cigarette, "for some reason" a vehicle caught defendant's attention. He then saw someone from the vehicle "pick up, like, a body . . . it was a boy." According to defendant, the way the body was picked up seemed "kind of odd," as the boy was "in his underwear," even though it was "super cold" outside, and had a "towel over his face." Defendant then saw a man with the boy "kind of run off—run off to this apartment complex," causing defendant to worry about his own son. Defendant, however, could not check

10

on the welfare of his son or other kids because of the restraining order, which he admitted had led to his arrest "a few times."

Defendant testified that a few days before the shooting, he found a knife in the backyard of his mother's home. Defendant became concerned about the knife because none of his family knew who it belonged to, and it appeared to have dried blood on the blade. Defendant kept the knife in his car because he wanted it tested for DNA.

Shortly before the shooting, defendant testified he was heading back to his mother's home in Escondido to do some laundry. Defendant told the jury he "was under the influence" and was "feeling a little paranoid" as he "start[ed] kind of tripping on certain cars." As he was nearing his mother's home, he noticed the white box truck and "tripped out," what he referred to as "tweaking." He sped up, exited the freeway, and parked at his mother's home on Fig.

As defendant waited in his car for his sister to bring him work clothes, he saw the box truck pass by. Believing it was not a coincidence, defendant left in his car and found the truck parked on the street. After waiting a "couple seconds," he drove back toward his mother's home. On his way, defendant pulled up to the truck, stopped, honked his car horn, and waved at the occupants not to "mad-dog[] them," as Conrado had testified, but more to acknowledge, "my bad."

While outside talking to his sister while waiting in his car, defendant saw the box truck across the street. Defendant told the jury he continued "tripping on the truck." As he watched the truck, he started worrying about himself, his family, including his kids, and decided "if [he was] going to end up dying, at least [he] want[ed] to leave some kind of record," as it was his

11

understanding that in a "homicide case," "everything gets looked at of the victim."

Defendant told the jury he soon began "tripping . . . hard" as he watched the white truck exit a driveway near his mother's home. Defendant concluded the occupants of the truck had murdered and/or kidnapped his family members, some of whom were inside the truck box. Defendant caught up to the truck, decided he needed to "put a stop to that truck, just disable" it, and, without thinking but instead just "reacting," he used a gun to "shoot[] at the truck," claiming he fired rounds into the truck only once, while stopped at the intersection, and not twice, as Freddy testified.

After shooting rounds into the truck, defendant testified he used his car to "ram[]" the truck in a further effort to disable it. Defendant admitted he rammed the truck several times, including at least three or four times while driving on Lincoln Parkway.

Regarding how he acquired the gun, defendant claimed it belonged to an individual who stored "stuff" at the garage where defendant worked. Defendant on direct testified he found the gun, after its owner claimed to have lost it along with his other "belongings." Defendant added, "I didn't have no place to leave that firearm but in my vehicle." On cross-examination, defendant testified he found the gun in some "bushes," near his mother's home.

As he "sum[med] up that day," defendant candidly stated it was "not really, like, a persuasive explanation" for his shooting rounds into, and using his car multiple times to ram, the truck. Even at trial, defendant still felt "people [were] targeting [his] kids," as he volunteered he had "made enemies" and had a "gang background."

In response to the prosecutor's question whether defendant almost became the killer of the truck's occupants, defendant testified, "I mean, on that day, yeah. There's a big possibility that, you know what? I think the driver, you know, yeah, could have lost his life."

Defendant also admitted on cross-examination that his .45 was a "powerful" weapon; that when he pulled up to the truck and honked his horn, he saw more than one person inside the truck; that the methamphetamine contributed to his concern for his family and his belief that the occupants in the truck were trying to harm them; that he did not call 911 for help or to report his concerns about his family's welfare, but instead "react[ed]" when he pursued the truck and shot at its occupants; and that he accepted responsibility for the shooting, stating: "I take blame for the shooting because I did it," while at the same time blaming the truck's occupants for "provok[ing] this fucking shit."

## DISCUSSION

A. *Defendant's Request for Reappointment of Counsel Immediately Before the Continued Preliminary Hearing*

1. Additional Background

Defendant's preliminary hearing was set for May 16, 2017. That morning, defense counsel Dan Segura informed the court that defendant was requesting a *Marsden*[4] hearing to raise what Segura anticipated was a section "1368" or competency issue. The record shows on questioning by the court, defendant wanted the preliminary hearing to go forward, stated he and his counsel were "having a big conflict of interest," and thus, he was left with "no choice but to call a *Marsden* hearing." The court cleared the courtroom.

---

[4] *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

13

On questioning by the court, defendant claimed he and Segura were not communicating, and Segura had done no investigation and had made no attempts to obtain "discovery," which defendant had been requesting for "months" and which he finally had received a week before. Defendant further claimed he did not "trust" Segura, whom he believed was "working for the prosecution." The court in response noted Segura was a "highly experienced attorney" who had "handled a number of murder" and other "high-profile" cases, and was a trained professional.

Segura informed the court that his disagreement with defendant stemmed from Segura's belief the defense "need[ed] to investigate [defendant's] mental health and his mental health history, his status on the date of this incident related to that." Segura noted he had made a "tactical" decision not to give defendant any discovery, including police reports, until after defendant had been evaluated, which was completed on April 20. Segura further noted that defendant did not want anyone from the defense speaking to his family, as defendant still believed they were in "danger."

As the hearing continued, and the court explained what defense counsel had been doing and why it was important to defendant's case, defendant, after repeating he did not trust Segura, informed the court he would go "pro per" if the court refused substitute counsel. The court responded, "So[,] you have one of the best lawyers up here assigned to you, and you think you can do a better job yourself?" to which defendant replied, "You know what, like I said, I have no choice. If I can't get a substitute, then I want to go pro per." The court stated it would consider that request at a future date.

The court denied defendant's request to remove Segura and appoint defendant new counsel. The court found defense counsel had been "going out

14

of his way to prepare a defense" and was "acting as a professional attorney would under the same circumstances." The *Marsden* hearing ended, and the court ordered the hearing transcript sealed.

Once joined by the prosecutor, Segura requested the court order defendant to undergo a mental competency exam pursuant to section 1368, stating defendant was unable to assist counsel due to "mental illness," which may become part of the defense. Defendant replied, "That request is bogus," then added, "I request to go pro per," repeatedly asking the court to proceed with the preliminary hearing. After further discussion, the court suspended criminal proceedings and ordered defendant to undergo a section 1368 evaluation. Defendant responded, "fuck you," then added, "Like I said, I don't give a fuck who you are on what power level" as he was escorted out of the courtroom.

Defendant gave informed consent for his July 2017 competency exam, noting "he [was] not entirely upset about the mental competency proceedings because 'this actually helps with [him] going Pro Per' because it will show that he is competent." During the examination, defendant stated that he was concerned by defense counsel's desire to pursue the "possibility of a 'not guilty by reason of insanity defense,' " and that was " 'not the kind of defense [defendant] want[ed]."

The examiner found that defendant was "oriented to person, place, and situation"; that his "thought process was intact" and his "thought content was appropriate to the situation"; that he suffered from "[a]ntisocial personality disorder," but "did not present with any significant symptoms of a psychiatric illness"; and that he was capable of understanding the nature of the criminal proceedings and assisting his attorney in conducting a defense in a rational

15

manner. The examiner thus recommended the resumption of criminal proceedings, which the court subsequently ordered.

In late January 2018, defendant renewed his request for substitute counsel, leading the court to conduct a second *Marsden* hearing. At the outset, the court noted it already had presided over defendant's competency hearing, which included testimony from mental health professionals and other witnesses. It further noted it would consider testimony from the competency hearing in deciding whether to grant defendant's request for appointment of new counsel.

Defendant during the *Marsden* hearing read a very lengthy declaration to support his request for new counsel. In that declaration, defendant stated that Segura had pursued a not guilty by reason of insanity defense without defendant's knowledge and consent; that defendant did not want to pursue such a defense, but instead wanted to "proceed with a defense of others, imperfect defense of others, affirmative defense"; and that, because Segura was pursuing a defense that had "no hope of success," defendant wanted new counsel appointed, citing *Strickland v. Washington* among other caselaw in support.

After hearing from Segura, who confirmed there had been a breakdown in communication, the court granted defendant's request for new counsel, despite the court's finding that Segura's approach to defendant's case had been "very practical, reasonable, and professional." The court noted that once new counsel was appointed, it was possible the new attorney would reach the same conclusions regarding the case as Segura.

Once back in open court, the record shows the office of the Alternate Public Defender accepted the appointment to represent defendant, and

16

entered a plea of not guilty on his behalf. The court set defendant's preliminary hearing for February 26, 2018.

On February 13, 2018, the court heard defendant's request to self-represent, which paperwork was submitted by newly appointed counsel. The record shows the court asked defendant a series of questions based on the forms that had been submitted; noted defendant, if convicted, was facing a "life" term plus 40 or 41 years; and made various other inquiries to ensure defendant understood the nature of his right to self-represent and the risks in his doing so. The defendant informed the court that for the past year he had "been studying the statutes and procedures" for his case; and that he was most concerned about the upcoming preliminary hearing and the motions he had prepared to file in connection with that hearing, once his application was approved.

When asked if he thought he could do a better job than his appointed counsel, defendant told the court: "It's not that I think. I just want to present a defense that I feel that I'm entitled to. And if I lose I'm the one that's going to do the time. So it's not like, really like, you know, this is my life we're talking about." Defendant went on to note that this was his second appointed attorney and this attorney, like Segura before him, was "not really trying to represent [defendant]."

The record shows the court strongly encouraged defendant to allow his newly appointed counsel, who had 29 years of experience and had tried 11 murder cases, to continue as appointed counsel, bluntly telling defendant: "You're making the wrong decision," and "You're gonna mess up your case." Defendant replied, "You know what, I appreciate your advice. But that's something I understand and I'm willing to do." The court granted

17

defendant's motion to proceed pro se, and defendant confirmed he would be ready for his upcoming preliminary hearing.

On April 10, 2018, the continued date set for the preliminary hearing, defendant sought an additional 50-day continuance to subpoena witnesses, prepare his cross-examination, and argue his motions. The prosecutor opposed the continuance, arguing the case had been "linger[ing]" as a result of the *Marsden* hearings, defendant's competency examination, and defendant's decision to proceed pro se. The prosecutor estimated the preliminary hearing would only take about 45 minutes, and three witnesses were present and prepared to testify at the hearing, including one witness defendant had subpoenaed (i.e., Margie B.).

The prosecutor also informed the court that defendant had filed a *Pitchess*[5] motion, and a representative from the Escondido City Attorney's office was present; and that certain delays in turning over information to defendant, including recordings from 911 calls and videos from body-worn cameras, were a result of defendant's refusal to sign a protective order. The court in response granted defendant a three-week continuance, setting the preliminary hearing for early May.

The parties appeared on May 2 for the preliminary hearing. At the outset of the hearing, defendant informed the court he was not ready to proceed because the prosecutor had delayed in producing certain body-camera videos. The prosecutor responded that defendant had been provided with a "certain number of body cams," but that, because defendant continued to refuse to sign the protective order, the prosecution was required to go through each video and, as a result of defendant's pro se status, redact

---

5    *Pitchess v. Superior Court* (1974) 11 Cal.3d 531. Defendant on appeal has not challenged the court's ruling on his *Pitchess* motion.

18

certain information as an "extra precaution." The prosecutor represented defendant already had everything he was legally entitled to for purposes of the preliminary hearing, and it therefore should go forward.

Defendant pivoted, next claiming he was not ready to proceed with the preliminary hearing because of the motions he had filed, including the motion to recuse the district attorney's office because the prosecutor was a "gang" prosecutor and defendant's case was not "gang related." After summarily denying that motion, the court yet again advised defendant it was a "mistake" for him to continue pro se, suggesting defendant lacked "objectiv[ity]" as he continued to raise issues not relevant to his defense. Although defendant claimed his due process rights were being violated, he responded, "Well, let's do it then" after the court indicated the preliminary hearing should proceed.

Later that morning in a different department, the parties appeared for the preliminary hearing. The judge reviewed defendant's pro per status, and advised defendant of the "pitfalls" of his decision and of his right to an attorney "at the public's cost." Defendant, for the first and perhaps only time since becoming self-represented, asked for reappointment of counsel. On further questioning, defendant informed the court that being pro per was "just a little too much for [him]," and claimed that he had gone pro per merely because defense counsel had refused to present the defense or defenses defendant wanted advanced.

After reviewing the pertinent history leading up to defendant's request to self-represent, the court asked, "What makes you think that anything is going to be different if another attorney is appointed to represent you?" The court then cogently noted that, based on defendant's prior relationships with defense counsel and his sudden decision to terminate his pro se status, it

19

appeared defendant was "trying to game the system, that—postpone the inevitable. The inevitable is a preliminary hearing. The inevitable if you're held to answer is a trial."

After defendant complained he was "not receiving a fair trial" and was "forced" to self-represent, the court correctly explained defendant was not there for a trial to determine "guilt or innocence," but was present "only to determine if the People have sufficient evidence to establish . . . probable cause. In other words, such a state of facts that would lead a person of ordinary caution and prudence to conscientiously entertain a strong suspicion of the guilt of the accused."

The court went on to explain that the "standard of evidence" to make such a finding was "very low"; that there would be "limited opportunity for cross-examination" of the two law enforcement witnesses as a result of Proposition 115[6]; and that the "worst possible consequence" to defendant was a "holding order at a very low standard of proof." As such, the court denied defendant's request to be "relieved" of his pro per status.

At the conclusion of the hearing, the court found there was sufficient evidence to bind defendant over for trial on all charges and accusations. Defendant then renewed his request to "waive" his "pro per rights." The

---

[6]     "Proposition 115, adopted by voters in 1990, allowed for admissibility of certain hearsay evidence in the analogous setting of a preliminary hearing in a criminal proceeding. (Cal. Const., art. I, § 30, subd. (b).) In particular, at a preliminary hearing, 'the finding of probable cause may be based in whole or in part upon the sworn testimony of a law enforcement officer . . . relating the statements of declarants made out of court offered for the truth of the matter asserted.' (Pen. Code, § 872, subd. (b).) An officer may so testify, however, only if he or she has ' "sufficient knowledge of the crime or the circumstances under which the out-of-court statement was made so as to meaningfully assist the magistrate in assessing the reliability of the statement." [Citation.]' (*Correa v. Superior Court* (2002) 27 Cal.4th 444, 452.)" *Bennett v. Superior Court* (2019) 39 Cal.App.5th 862, 884, fn. 6.)

court in response advised defendant to seek counsel from the Alternate Public Defender's office if he was sincere in this request.

At his arraignment two weeks later, defendant changed his mind and decided he wanted to continue pro se. The court advised defendant to accept representation, after defendant expressed concern over losing his driver's license if convicted on count 5. The court reminded defendant that, if convicted, the offenses "carr[ied] the possibility of a life term in prison." Defendant refused to accept the appointment of counsel. The court set the case for further hearing, with trial to begin on August 20.

The prosecutor at the June 14, 2018 readiness conference informed the court he had complied with all of defendant's discovery requests, other than any defendant had made "as of today's date," and was ready to start trial on August 20. Claiming he was still owed discovery, defendant requested a trial continuance. The prosecutor responded that defendant had already received video footage from the officers' body-worn cameras that had been germane to the preliminary hearing; but that defendant had not received all of the video footage because he was still refusing to sign the protective order, thus requiring the prosecution to review and redact each video. The prosecutor added defendant would have all the videos in the next couple of weeks, and "well before 30 days before trial."

Later during the hearing, defendant stated he wanted to file a "nonstatutory motion to dismiss" as a result of being "deprived of a substantial right during the preliminary hearing." The court, after summarily denying the motion, observed, "Mr. Herrera, you don't know what you're doing," and asked, "Do you want counsel?" To which defendant responded, "I want to make a motion to recuse you." The court set the case for "further readiness" on July 14, with a trial date of August 20.

At the July 14 readiness conference, the court reviewed a series of motions defendant had filed, a fact borne out by the lengthy appellate record in this case. The court informed defendant most of his motions would be heard in another department or by the trial judge, as defendant was then in a "calendar department." Defendant then requested a 60-day trial continuance. The prosecutor agreed to the continuance, but requested it be defendant's last. The court set trial for October 1. Before doing so, the court again advised defendant to obtain the assistance of counsel. Defendant affirmatively represented he wanted to continue pro se.

At the September 28 status conference, after addressing many of the same issues raised by defendant in earlier hearings, and after ordering defendant be afforded "extensive library privileges" to prepare for trial, the court again advised defendant to seek the assistance of counsel. It was more of the same at the October 12 status and readiness conference, where the court went through the myriad reasons why it "would truly be the right decision for [defendant]" to accept the appointment of counsel. As before, defendant stated he wanted to continue pro se, as he believed "waiv[ing such] . . . rights would be setting [himself] up for failure."

Near the conclusion of the hearing, after defendant again raised an issue related to the body-worn camera videos, the prosecutor noted for the record that, should defendant wait until the day of trial to seek appointment of counsel, such a request should "be considered . . . untimely" and thus denied. The court advised defendant trial would start in two weeks, and again encouraged him to agree to the appointment of counsel. Defendant replied, "You know, for the record, just to reassure [the prosecutor] and the Court, . . . I'm not going to wait [']till the last minute and waive my pro per

22

rights. I'm going to go all the way to trial being pro per," which statement defendant then repeated.

2. Guiding Principles

"In all criminal prosecutions, the accused shall enjoy the right to . . . have the Assistance of Counsel for his defense." (U.S. Const., 6th Amend.) Although a criminal defendant has the right to be represented by counsel, a defendant may choose to waive that right and represent himself or herself. (*Faretta v. California* (1975) 422 U.S. 806, 821 (*Faretta*) [recognizing that the "Sixth Amendment . . . implies a right of self-representation"].)

In order to invoke the right of self-representation, a defendant must unequivocally make a request within a reasonable time prior to the trial. (*People v. Frierson* (1991) 53 Cal.3d 730, 742.) Further, the defendant must also knowingly and intelligently waive the right to counsel. (*People v. Hall* (1990) 218 Cal.App.3d 1102, 1105 (*Hall*) [concluding a "knowing and intelligent waiver of the right to counsel is required before the criminal defendant is permitted to represent himself or herself"].)

The constitutional requirement of a knowing and intelligent waiver of the right to counsel is designed for the protection of the criminal defendant: "When an accused manages his own defense, he relinquishes, as a purely factual matter, many of the traditional benefits associated with the right to counsel. For this reason, in order to represent himself, the accused must 'knowingly and intelligently' forgo those relinquished benefits. [Citations.] Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.' " (*Faretta, supra*, 422 U.S. at

23

p. 835.)

Pertinent to the instant case, a pro se defendant does *not*, however, have a constitutional right to change the status of his or her representation on the day of his or her preliminary hearing (see *People v. Boulware* (1993) 20 Cal.App.4th 1753, 1756 (*Boulware*)); or midtrial during a capital murder case. (See *People v. Gallego* (1990) 52 Cal.3d 115, 163-164 (*Gallego*).) Under those circumstances, whether or not to appoint counsel to a pro se defendant is left to the "sound discretion of the trial court" (*Boulware*, at p. 1756), which, in making such a decision, should consider the " 'totality of the facts and circumstances.' " (*Gallego*, at p. 164; see *People v. Windham* (1977) 19 Cal.3d 121, 124 [noting it is within the trial court's discretion whether a defendant may dismiss counsel and proceed pro se after the commencement of trial].)

3. <u>Analysis</u>

Here, defendant on appeal wisely does not contend his waiver of his Sixth Amendment right to counsel, made applicable to state courts by the Fourteenth Amendment (*Gideon v. Wainwright* (1963) 372 U.S. 335, 342), was not knowing and intelligent. (See *Hall*, *supra*, 218 Cal.App.3d at p. 1105.) As summarized *ante*, the record unambiguously shows that he was repeatedly warned on myriad occasions by several different judges about the "pitfalls" of self-representation, particularly in light of the seriousness of the charges he was facing and his lack of legal experience and training; and that on each occasion, except at the May 2 preliminary hearing, he steadfastly rejected such advice and confirmed he wanted to proceed pro se.

The record also shows the court on the morning of May 2 stated the preliminary hearing would take place in a different department. Defendant, however, again requested a continuance of the hearing, arguing he was still

24

waiting for certain discovery which, as noted, was delayed because of *his* refusal to sign a protective order. When the court denied that request, defendant raised other arguments in support of a continuance. When the court also rejected these arguments, defendant exclaimed, "Well, Let's do it then."

However, a short time later in a different department, defendant had a sudden change of heart. It was then, for the first and what appears to be the only time since becoming self-represented, defendant asked for reappointment of counsel. In refusing that request, the court correctly found that defendant already had terminated the relationship of two highly experienced, court-appointed attorneys because defendant wanted to control his defense; that it did not appear "anything [was] going to be different if another attorney [was] appointed to represent" defendant; and that it appeared defendant was "trying to game the system."

When viewed in light of the totality of the facts and circumstances as of May 2, we have little difficulty in concluding the court properly exercised its discretion when it refused defendant's last-minute request for reappointment of counsel, which request, if granted, ostensibly would have led to yet another continuance of the "inevitable."

We further conclude that, even *if* the court abused its discretion in refusing defendant's request for reappointment of counsel immediately before the preliminary hearing commenced, such error was harmless even under the beyond a reasonable doubt standard. (See *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*).)

Indeed, as also summarized *ante*, the record shows about two weeks after the preliminary hearing, defendant at his arraignment informed the court he wanted to continue pro se, despite the court's representation it

25

would reappoint him counsel *if* defendant made such a request.  As shown by the record evidence, this pattern of defendant being advised to accept reappointment of counsel and his steadfast refusal to do so continued at each subsequent hearing, including at the continued status and readiness conference about two weeks before trial.

Our extensive review of the record shows defendant received a fair trial in light of *his* decision to proceed pro se.  Both the trial court and the prosecutor were extremely patient with defendant, went out of their way to explain various procedures to him, and helped him within the confines of the law to ensure justice was served, as defendant himself admitted during the trial.[7]

The effect of the preliminary hearing was merely to hold defendant to answer to the charges in the complaint, as the court explained to defendant at the commencement of that hearing.  We discern no prejudice to defendant in remaining pro se for the preliminary hearing, where the standard of proof was, as noted by the court, "very low," and when he continued pro se following the preliminary hearing through trial.

Thus, we conclude that, even *if* the court abused its discretion in refusing defendant's request for reappointment of counsel at the May 2 continued preliminary hearing, such error was harmless beyond a reasonable doubt.  (See *Boulware, supra*, 20 Cal.App.4th at p. 1757 [applying *Chapman*

_____

[7]    The record shows during a recess after the close of testimony, the court stated it would allow defendant to retake the stand, if necessary, to provide additional testimony for his requested imperfect self-defense instruction (discussed *post*).  The court then stated, "Mr. Herrera, I hope we have given you a chance," to which defendant replied, "You know what?  It was—you guys—yes, your honor.  I don't have no complaints."  The court then stated, "That's our job," and reminded defendant the prosecutor and judge were "different," and "don't work for each other."

standard in finding that, even if the court erred in refusing to appoint the defendant counsel for the preliminary hearing, which request the defendant had first made at the hearing and without notice to the prosecution, such error was harmless because the defendant could not show how he was prejudiced by that decision].)

B. *Preservation of the Chevy as Potential Exculpatory Evidence*

1. Additional Background

In early April 2018, defendant filed a handwritten motion[8] seeking "sanctions on the prosecution" for what he claimed was the "intentional, bad-faith loss or destruction of material evidence," namely his 1997 Chevy Lumina. Defendant claimed his car was material to rebut "certain charges and allegations, and it would [have] impeached the statements and credibility of witness (Marg[ie] B[.])."

Defendant in support of his motion claimed the charges against him for "premeditated attempted murder, and assault with a semi-automatic firearm," were based on the "specific statement" by Margie that she saw the Chevy driver (i.e., defendant) pull up along-side the truck, exit his car, and fire "rounds at the truck using his vehicle as a shooting platform." Defendant acknowledged in his motion that on June 21, 2017, he "was notified by [his] family that the Escondido Police Department had lifted the evidence hold on [his] vehicle, and that [he] had until 07/31/2017 to get [his] vehicle out of the impound or else it would be sold," attaching various exhibits in support thereof.

Exhibit C was a July 31, 2017 notice of pending lien sale for a car valued at $4,000 or less, showing an amount due in excess of $2,700 for the

---

8 Certain portions of the record copy of this motion are difficult to read and/or illegible.

27

storage and towing of the Chevy, with a sale date scheduled for September 5, 2017. Exhibit D was a March 6, 2018 letter from the Escondido chief of police explaining that it was "customary for the police department to release an evidentiary hold on a vehicle once it is no longer needed for investigation or court purposes," requiring the owner, at his or her expense, to "retain[] the vehicle . . . if [he or she] deem[ed] it relevant to [his or her] case."

Defendant's sanctions motion, as amended on October 23, was heard on October 30, 2018. At that hearing, the prosecutor noted he had responded to the motion in his trial brief, noting it was an "easy one" to resolve as defendant's car had been seized, defendant had received notice of such, and that despite various notices, nobody from the defense had claimed the car, leading to its forced sale.

The prosecutor also noted defendant's motion was based entirely on the statements of Margie. The prosecutor represented that her testimony was not material to the People's case, remarking: "I don't even need her. The only reason she is on my witness list is because Mr. Herrera subpoenaed her. If he thinks she is that important to me, he can take her off his witness list, and I won't call her. But if he wants her to testify, I'll call her. It's no problem."

The prosecutor also addressed the claim raised by defendant in his amended sanctions motion that preservation of the Chevy was required because he wanted the car tested for "gunshot residue." The prosecutor argued "none of that matter[ed]" because the defense(s) pursued by the defendant required him to "admit that he was the shooter, which he is going to do," and which, as noted *ante*, he subsequently did admit. The court, in denying the motion, noted defendant then already had admitted to being the

28

shooter in the case, and thus, it disagreed his case was "impacted by not having the vehicle."

2. Guiding Principles and Analysis

"Law enforcement agencies must preserve evidence only if it possesses exculpatory value 'apparent before [it] was destroyed,' and not obtainable 'by other reasonably available means.' [Citations.] The state's responsibility is further limited when the defendant challenges the failure to preserve evidence 'of which no more can be said then that it could have been subjected to tests' that might have helped the defense. [Citation.] In such a case, unless the defendant can show 'bad faith' by the police, failure to preserve 'potentially useful evidence' does not violate his [or her] due process rights. [Citation.]" (*People v. DePriest* (2007) 42 Cal.4th 1, 41-42 (*DePriest*), citing among cases *California v. Trombetta* (1984) 467 U.S. 479 and *Arizona v. Youngblood* (1988) 488 U.S. 51.)

If the defendant demonstrates that significant exculpatory evidence was lost, or establishes bad faith in connection with the loss of potentially useful evidence, the trial court has discretion to impose appropriate sanctions. (*People v. Medina* (1990) 51 Cal.3d 870, 894 (*Medina*).) Such sanctions may include fashioning suitable cautionary instructions. (*Ibid.*) The reviewing court "must determine whether, viewing the evidence in the light most favorable to the superior court's finding, there was substantial evidence to support its ruling." (*People v. Roybal* (1998) 19 Cal.4th 481, 510 (*Roybal*); see *People v. Memro* (1995) 11 Cal.4th 786, 831 [noting that a "trial court's inquiry whether evidence was destroyed in good faith or bad faith is essentially factual: therefore, the proper standard of review is substantial evidence"].)

29

### a. Forfeiture

Before reaching the merits, we conclude defendant forfeited this claim of error on appeal because as noted, the Chevy was impounded in late November 2016, at the time of the shooting, and was not sold until September 2017, or about 10 *months* later.  Beginning in February 2017, defendant became self-represented, and he acknowledged in his motion receiving notice in June that his car would be sold to pay for storage and other fees.

Thus, if defendant wanted to test the Chevy for gunshot residue, believing such evidence was somehow material to his case (a point we address *post*), it was incumbent on *him* as a self-represented litigant to take steps to conduct such testing, and/or to retain the car for any other reason he believed, reasonably or unreasonably, was required for his case.  Instead, he waited until April 2018 to file his sanctions motion.  His failure to take affirmative measures either to have the car tested while it was in storage, or to retain it after receiving notice it would be sold, forfeits this claim of error.

### b. Merits

Reaching the merits, defendant's sanctions motion provided he wanted to use potential evidence from the Chevy to "impeach" the testimony of Margie, who witnessed the shooting.  In his amended motion, defendant was more specific, stating he had wanted to test the car for gunshot residue to rebut Margie's claim that he had exited the car and used its roof as a platform to shoot at the truck.

We conclude defendant failed to demonstrate that his car contained " 'potentially useful' " exculpatory evidence.  (See *DePriest*, *supra*, 42 Cal.4th at p. 42.)  As noted *ante*, the record shows defendant admitted shooting at least five rounds from his "powerful" .45 into the side of the truck.  Whether

30

defendant fired the rounds from inside the Chevy, as he claimed, or exited the car and used the car's hood as a platform to shoot at the truck, appears to be a nonissue in light of his concession. We thus conclude the court properly exercised its discretion (see *Medina*, *supra*, 51 Cal.3d at p. 894) in finding the car had no exculpatory value, a finding we further conclude is supported by substantial record evidence. (See *Roybal*, *supra*, 19 Cal.4th at p. 510.)

Moreover, even *if* defendant established the Chevy had some apparent exculpatory value before it was sold, he cannot show the prosecutor and/or law enforcement acted in bad faith in failing to preserve the car as evidence. (See *DePriest*, *supra*, 42 Cal.4th at p. 42.)

First, there appears to be a lack of substantial evidence law enforcement knew the Chevy contained potentially exculpatory evidence before it, with proper notice, released the car for sale months later. (See *People v. Beeler* (1995) 9 Cal.4th 953, 976, overruled on another ground as stated in *People v. Pearson* (2013) 56 Cal.4th 393, 462; compare *United States v. Zaragoza-Moreira* (2015) 780 F.3d 971, 974 [concluding the government acted in bad faith in destroying a video of the defendant's border crossing in which she was found in possession of drugs because a transcript of the video showed the government knew the video was potentially exculpatory before it was destroyed].) Second, even without Margie's testimony, there was more than sufficient record evidence to support defendant's conviction for attempted willful, deliberate, and premeditated murder (counts 1 and 2),[9]

---

[9] The jury was instructed as follows with a modified version of CALCRIM No. 600: "The defendant is charged in Counts 1 and 2 with attempted murder. [¶] To prove that the defendant is guilty of attempted murder, the People must prove that: [¶] 1. The defendant took at least one direct but ineffective step toward killing another person; [¶] AND [¶] 2. The defendant intended to kill that person. [¶] A *direct step* requires more than merely planning or preparing to commit murder or obtaining or arranging for

31

and assault with a firearm (counts 3 and 4),[10] including the testimony of

Freddy and/or Conrado, as summarized *ante.* Thus, defendant was not

---

something needed to commit murder. A direct step is one that goes beyond planning or preparation and shows that a person is putting his or her plan into action. A direct step indicates a definite and unambiguous intent to kill. It is a direct movement toward the commission of the crime after preparations are made. It is an immediate step that puts the plan in motion so that the plan would have been completed if some circumstance outside the plan had not interrupted the attempt.

The jury also was given CALCRIM No. 601, modified as follows: "If you find the defendant guilty of attempted murder under Count 1 and 2, you must then decide whether the People have proved the additional allegation that the attempted murder was done willfully, and with deliberation and premeditation. [¶] The defendant acted *willfully* if he intended to kill when he acted. The defendant *deliberated* if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill. The defendant acted with premeditation if he decided to kill before completing the act of attempted murder. [¶] The length of time the person spends considering whether to kill does not alone determine whether the attempted killing is deliberate and premeditated. The amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances. A decision to kill made rashly, impulsively, or without careful consideration of the choice and its consequences is not deliberate and premeditated. On the other hand, a cold, calculated decision to kill can be reached quickly. The test is the extent of the reflection, not the length of time. [¶] The People have the burden of proving this allegation beyond a reasonable doubt. If the People have not met this burden, you must find this allegation has not been proved."

[10]     The jury also was instructed as follows with a modified version of CALCRIM No. 875:  "The defendant is charged in Counts 3 and 4 with assault with a semiautomatic firearm in violation of Penal Code section 245(b). [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant did an act with a semiautomatic firearm that by its nature would directly and probably result in the application of force to a person; [¶] 2. The defendant did that act willfully; [¶] 3. When the defendant acted, he was aware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in the application of force to someone; [¶] AND [¶] 4. When

32

prejudiced by any potential error in failing to preserve the Chevy even under the harmless beyond a reasonable doubt standard. (See *Chapman, supra,* 386 U.S. at p. 24.)[11]

C. *Attempted Voluntary Manslaughter Based on Imperfect Self-Defense*

1. Additional Background

After defendant testified, outside the presence of the jury he asked the court to include various instructions in the jury instruction packet. The prosecutor, anticipating defendant might raise a voluntary intoxication defense, submitted points and authorities to show that while defendant could

---

the defendant acted, he had the present ability to apply force with a semiautomatic firearm to a person[.] [¶] Someone commits an act *willfully* when he or she does it willingly or on purpose. It is not required that he or she intend to break the law, hurt someone else, or gain any advantage. [¶] The terms *application of force and apply force* mean to touch in a harmful or offensive manner. The slightest touching can be enough if it is done in a rude or angry way. Making contact with another person, including through his or her clothing, is enough. The touching does not have to cause pain or injury of any kind. [¶] The touching can be done indirectly by causing an object or someone else to touch the other person. [¶] The People are not required to prove that the defendant actually touched someone. [¶] The People are not required to prove that the defendant actually intended to use force against someone when he acted. [¶] No one needs to actually have been injured by defendant's act. But if someone was injured, you may consider that fact, along with all the other evidence, in deciding whether the defendant committed an assault. [¶] Voluntary intoxication is not a defense to assault. [¶] A *firearm* is any device designed to be used as a weapon, from which a projectile is discharged or expelled through a barrel by the force of an explosion or other form of combustion. A *semiautomatic pistol* extracts a fired cartridge and chambers a fresh cartridge with each single pull of the trigger."

11   Because we conclude there no was no error and, even if such error existed, it was harmless with respect to the preservation of the Chevy, we reject defendant's additional claim that the court erred by refusing to instruct the jury it could draw an adverse inference from the failure of law enforcement and/or the prosecution to preserve it.

33

"argue voluntary intoxication in this case to negate premeditation . . . in counts 1 and 2, he cannot use imperfect self-defense."

After the lunch recess, the court outside the presence of the jury noted there had been an "extensive" discussion off the record regarding defendant's requested instructions. The court announced its rulings on the record as follows: "CALCRIM 603 [attempted voluntary manslaughter: heat of passion—lesser included offense] will not be given, CALCRIM 604 [attempted voluntary manslaughter: imperfect self-defense—lesser included offense] will not be given, and CALCRIM 3426 [voluntary intoxication] will not be given."

2. Guiding Principles

CALCRIM No. 604 provides: "An attempted killing that would otherwise be attempted murder is reduced to attempted voluntary manslaughter if the defendant attempted to kill a person because (he/she) acted in imperfect (self-defense/ [or] defense of another). [¶] If you conclude the defendant acted in complete (self-defense/ [or] defense of another), (his/her) action was lawful and you must find (him/her) not guilty of any crime. The difference between complete (self-defense/ [or] defense of another) and imperfect (self-defense/ [or] defense of another) depends on whether the defendant's belief in the need to use deadly force was reasonable. [¶] The defendant acted in imperfect (self-defense/ [or] defense of another) if: [¶] 1. The defendant took at least one direct but ineffective step toward killing a person. [¶] 2. The defendant intended to kill when (he/she) acted. [¶] 3. The defendant believed that (he/she/ [or] someone else/ *insert name of third party*>) was in imminent danger of being killed or suffering great bodily injury. [¶] AND [¶] 4. The defendant believed that the immediate use of deadly force was necessary to defend against the danger. [¶] BUT [¶] 5. At least one of the defendant's beliefs was unreasonable.

34

"[*Great bodily injury* means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm.]"

"Belief in future harm is not sufficient, no matter how great or how likely the harm is believed to be. The defendant must have actually believed there was imminent danger of death or great bodily injury to (himself/herself/ [or] someone else)."

"In evaluating the defendant's beliefs, consider all the circumstances as they were known and appeared to the defendant."

"[If you find that _____ <*insert name or description of alleged victim*> threatened or harmed the defendant [or others] in the past, you may consider that information in evaluating the defendant's beliefs.]"

"[If you find that the defendant knew that _____ <*insert name or description of alleged victim*> had threatened or harmed others in the past, you may consider that information in evaluating the defendant's beliefs.]"

"[If you find that the defendant received a threat from someone else that (he/she) reasonably associated with _____ <*insert name or description of alleged victim*>, you may consider that threat in evaluating the defendant's beliefs.]"

"The People have the burden of proving beyond a reasonable doubt that the defendant was not acting in imperfect self-defense. If the People have not met this burden, you must find the defendant not guilty of attempted murder."

" 'Under the doctrine of imperfect self-defense, when the trier of fact finds that a defendant killed [or attempted to kill] another person because the defendant *actually*, but unreasonably, believed he [or she] was in imminent danger of death or great bodily injury, the defendant is deemed to have acted without malice and thus can be convicted of no crime greater than

35

voluntary manslaughter.' [Citations.] In such a situation, unreasonable or imperfect self-defense is not a true defense, but instead is a shorthand description of one form of voluntary manslaughter, a lesser included offense of murder [or attempted murder]. [Citation.] 'Accordingly, when a defendant is charged with murder [or attempted murder] the trial court's duty to instruct sua sponte . . . on unreasonable self-defense is the same as its duty to instruct on any other lesser included offense: this duty arises whenever the evidence is such that a jury could reasonably conclude that the defendant killed [or attempted to kill] the victim in the unreasonable but good faith belief in having to act in self-defense.' [Citation.]" (*People v. Mejia-Lenares* (2006) 135 Cal.App.4th 1437, 1446.) Thus, absent substantial evidence, a trial court is not required to instruct the jury on imperfect self-defense. (*Ibid.*)

    3. Analysis

Here, nothing but speculation and conjecture support the view that the occupants of the truck, Freddy and Conrado, were trying to hurt defendant and/or his family, leading defendant, albeit unreasonably, to use attempted deadly force in response. (See, e.g., *People v. Wright* (2016) 4 Cal.App.5th 537, 546 ["speculation is not evidence"].) As such, we independently conclude the court properly refused to give CALCRIM No. 604. (See *People v. Licas* (2007) 41 Cal.4th 362, 366 (*Licas*) [applying the " 'independent or de novo standard of review to the failure by the trial court to instruct on an assertedly lesser included offense' "]; see also *People v. Zapien* (1993) 4 Cal.4th 929, 976 (*Zapien*) [noting a " ' "ruling or decision, itself correct in law, will not be disturbed on appeal" ' " merely because it is given for a different reason].)

36

We further conclude the court's decision not to give CALCRIM No. 604 was proper because a claim of imperfect self-defense, like a claim of perfect self-defense, is unavailable when a defendant first assaults the victim or victims, as occurred here. (See *People v. Valencia* (2008) 43 Cal.4th 268, 288 (*Valencia*); see also *Zapien, supra*, 4 Cal.4th at 976.)

Finally, the uncontested record evidence also shows defendant was "tripping hard" and "under the influence" of methamphetamine when he first contacted the truck as he drove to his mother's home in Escondido; and later, as he pursued, shot at, and rammed the truck multiple times. Defendant engaged in these acts because he believed his family members, including his children, had been kidnapped or harmed by a "satanical" or "pedophile group" and were in the truck box. Defendant's belief was based in part on an incident from the night before, when, after using methamphetamine, he went outside and saw a "dead" boy with a "towel" around his head, which reminded defendant of his own son.

Although a jury may consider evidence of voluntary intoxication on the issue of intent to kill, such evidence is inadmissible to support an imperfect self-defense. (*People v. Soto* (2018) 4 Cal.5th 968, 970 [concluding a jury may consider "evidence of voluntary intoxication on the question of whether defendant intended to kill but not on the question of whether he believed he needed to act in self-defense"]; see *People v. Elmore* (2014) 59 Cal.4th 121, 137–139 [concluding "[u]nreasonable self-defense was never intended to encompass reactions to threats that exist only in the defendant's mind"].) For

this separate reason, we independently conclude the court properly refused to give CALCRIM No. 604.[12]

D. *Credibility*

At trial, defendant stipulated he had suffered a prior felony conviction pertaining to counts 6 and 7, carrying a loaded firearm in a vehicle after being previously convicted of a felony, and unlawful possession of a firearm by a felon, respectively.

Defendant on appeal contends the court erred when it instructed the jury with a portion of CALCRIM No. 226[13] [witnesses] and CALCRIM No. 316[14] [additional instructions on witness credibility—other conduct] because it allowed the jury to consider his prior felony conviction(s) to evaluate his credibility on *all* counts. Defendant further contends the error was prejudicial because his "defense rested on whether the jury believed his

---

[12]    Based on our decision, we need not consider the People's alternate contentions that giving CALCRIM No. 604 would have violated public policy; or that any alleged error in failing to give the instruction was harmless. (See *People v. Villanueva* (2008) 169 Cal.App.4th 41, 52 (*Villanueva*) [applying the *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*) standard of prejudice in reviewing the trial court's failure to instruct on self-defense].)

[13]    CALCRIM No. 226 in part instructed the jury that it alone must judge the credibility or believability of the witnesses based on a series of such factors including, as relevant here, whether the witness had been convicted of a felony.

[14]    CALCRIM No. 316 provided: "If you find that a witness has been convicted of a felony, you may consider that fact only in evaluating the credibility of the witness's testimony. The fact of a conviction does not necessarily destroy or impair a witness's credibility. It is up to you to decide the weight of that fact and whether that fact makes the witness less believable."

version of the events." We find these contentions unavailing, bordering on frivolous.

1. Forfeiture

It is axiomatic that in criminal cases a "trial court must instruct on general principles of law relevant to the issues raised by the evidence and necessary for the jury's understanding of the case." (*People v. Martinez* (2010) 47 Cal.4th 911, 953.) We review arguments of instructional error de novo. (See *Licas*, *supra*, 41 Cal.4th at p. 366.) We determine whether any instructional error is harmless by examining the entire record. (*People v. Flood* (1998) 18 Cal.4th 470 503; *People v. Campbell* (2015) 233 Cal.App.4th 148, 167.)

In general, " ' "a party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language." ' " (*People v. Palmer* (2005) 133 Cal.App.4th 1141, 1156 (*Palmer*); accord, *People v. Nguyen* (2015) 61 Cal.4th 1015, 1051 [concluding that if the defendant "believed the instruction was incomplete or misleading, [the defendant] 'had the obligation to request clarifying language' "]; but see *People v. Mackey* (2015) 233 Cal.App.4th 32, 106 [noting a " 'defendant need not object to preserve a challenge to an instruction that incorrectly states the law and affects his or her substantial rights' "].)

Here the record shows defendant did not request clarifying or amplifying language before the court gave CALCRIM Nos. 226 and 316. In addition, both instructions were correct statements of the law (see *Palmer*, *supra*, 133 Cal.App.4th at p. 1156); and neither instruction affected his substantial rights, as the instructions, as relevant here, merely advised the jury it could consider his prior felony conviction in assessing credibility. (See

*People v. Hovarter* (2008) 44 Cal.4th 996 [stating the general rule that "the trier of fact is the sole arbiter of the credibility of a witness"].)  Defendant therefore forfeited on appeal any claim of error regarding the use of CALCRIM Nos. 226 and/or 316.  (*Palmer*, at p. 1156.)

2. <u>Merits</u>

Even if defendant has not forfeited the argument on appeal, any error in giving CALCRIM Nos. 226 and/or 316 was harmless because it is not "reasonably probable that a result more favorable to [defendant] would have been reached in the absence of the error."  (See *People v. Jones* (2012) 54 Cal.4th 1, 53 [evaluating instructional error under the " 'reasonable probability' " standard of *Watson*]; *Villanueva, supra,* 169 Cal.App.4th at p. 52 [same].)  An instructional error is harmless where the evidence of guilt is overwhelming.  (*People v. Carrington* (2009) 47 Cal.4th 145, 188 (*Carrington*); *People v. Covarrubias* (2015) 236 Cal.App.4th 942, 954.)

As summarized *ante*, the record discloses more than sufficient evidence such that a jury reasonable jury could find defendant guilty beyond a reasonable doubt on all counts, and the enhancements appended to such counts, true.  (See *Carrington, supra,* 47 Cal.4th at p. 188.)  Given such overwhelming evidence, even if the court had not given CALCRIM Nos. 226 and/or 316—which merely informed the jury that it *could*, but was not *required*, to consider defendant's prior felony conviction(s), we conclude there is no reasonable likelihood that the result of the trial would have been any different.  (See *In re Crew* (2011) 52 Cal.4th 126, 150 [noting " ' "[a]

reasonable probability is a probability sufficient to undermine confidence in the outcome" ' "].)[15]  We thus reject this claim of error.

    E.  *Demonstrative Evidence*

    1.  <u>Additional Background</u>

Defendant next contends the court prejudicially erred in admitting over objection a two-minute long video demonstration of law enforcement firing the same type of gun defendant used in committing certain of the offenses. According to the prosecutor, the video (which was not included in the appellate record) showed officers firing the gun into a vehicle.  The prosecutor argued the video was probative as it showed how the gun was fired and expended cartridge cases, and its power.

The court ruled to admit the video, finding under Evidence Code section 352[16] that the probative value of such evidence outweighed any potential prejudicial effect, inasmuch as the video was "probative of all counts with the exception of the assault with a deadly weapon, being the vehicle" (i.e., count 5).  The court explained:  "I think it's important to show that this is one example of the power of the semi-automatic handgun, because obviously a smaller caliber weapon would not have made that impact.  But this weapon, particularly when fired into a truck body, the body of the truck,

_____

15    Even under the more stringent test in *Chapman*, *supra*, 386 U.S. at page 24, the error was harmless beyond a reasonable doubt in light of the totality of jury instructions provided and the overwhelming evidence of defendant's guilt.

16    Evidence Code section 352 provides:  "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

in the area of the cab was quite capable of injuring or killing the two individuals inside the truck cab."

The video was authenticated by Tom Love, a detective in the special investigative unit of the Escondido Police Department. Detective Love testified the .45 used by defendant was a "larger" weapon on the "spectrum of semi-automatic firearms" and "produce[d] a lot of energy," such that the "wound cavity" from such a weapon would be expected to be "much larger" than from other semi-automatic weapons, giving rise to the potential of "hit[ting] more important vital areas" of the body. Detective Love opined that a round fired from a .45 was capable of penetrating a vehicle and hitting a human body.

2. Guiding Principles

" 'Evidence of demonstration engaged in to test the truth of testimony that a certain thing occurred is admissible only where (1) the demonstration is relevant, (2) its conditions and those existing at the time of the alleged occurrence are shown to be substantially similar and (3) the evidence will not consume undue time or confuse or mislead the jury. [Citation.] The party offering the evidence bears the burden of showing that the foundational requirements have been satisfied.' [Citation.] [¶] The probative value of evidence of the reenactment of a crime depends primarily on its similarity to the events and conditions that existed at the time of the crime. [Citations]." (*People v. Rivera* (2011) 201 Cal.App.4th 353, 363 (*Rivera*).)

"To be admissible, demonstrative evidence must . . . accurately depict what it purports to show. [Citation.] The demonstration . . . ' "must have been conducted under at least substantially similar, although not necessarily absolutely identical, conditions as those of the actual occurrence." ' [Citations.] ' "Within these limits, ' "the physical conditions which existed at

42

the time the event in question occurred need not be duplicated with precision nor is it required that no change has occurred between the happening of the event and the time" ' " ' of the reenactment. [Citations.]" (*Rivera*, *supra*, 201 Cal.App.4th at p. 363.) "On appeal, we review the trial court's ruling on the admissibility of [such] evidence for abuse of discretion. [Citations.]" (*Id.* at p. 362.)

### 3. Analysis

Here, we conclude the court properly exercised its broad discretion in admitting the short video showing officers firing the same type of gun defendant used in the shooting, including a demonstration of rounds being fired into a vehicle. As the trial court noted, the video was relevant to all counts except count 5. As the court further noted, the video was particularly probative on the issue of intent to kill (i.e., counts 1 and 2).

Finally, the video was only two-minutes long and was not particularly inflammatory, given the other evidence in the case, including defendant's own testimony that his firing from a short distance multiple rounds into the driver-side of the truck created a "big possibility" that the driver "could have lost his life." (See *Rivera*, *supra*, 201 Cal.App.4th at p. 363.) For these reasons, and because any error in admitting the short video was, in any event, harmless under either test for prejudice in light of the overwhelming evidence of defendant's guilt (see *Chapman*, *supra*, 386 U.S. at p. 24; *Watson*, *supra*, 46 Cal.2d at p. 836), we reject this claim of error.

### F. *Knife Evidence*

### 1. Additional Background

Defendant moved pretrial to exclude evidence of two knives recovered from the Chevy. As noted *ante*, it was *defendant* who brought up the subject of the large "bladed knife," after police contacted him immediately after the

shooting and chase. Defendant told police the knife was in his car because he believed there was dried blood on it and he wanted it tested for human DNA. Defendant also told police he had found the knife a day or two earlier in the backyard of his mother's home, and he was concerned about his mother's welfare as a result. The court denied defendant's motion to exclude evidence of the knives, but agreed to give the jury a limiting instruction.[17]

## 2. Guiding Principles

"Except as otherwise provided by statute, all relevant evidence is admissible." (Evid. Code, § 351.) " 'Relevant evidence' means evidence . . . having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (*Id.*, § 210; see *People v. Scheid* (1997) 16 Cal.4th 1, 13–14 [noting the "test of relevance is whether the evidence tends ' "logically, naturally, and by reasonable inference" to establish material facts such as identity, intent, or motive [citations]' "].)

However, even if relevant, a court may exclude such evidence under Evidence Code section 352. We review the trial court's decision to admit evidence under an abuse of discretion standard. (*People v. Rogers* (2013) 57 Cal.4th 296, 326.)

## 3. Guiding Principles

We conclude the court properly exercised its broad discretion in admitting the knife evidence. This evidence supported the finding that defendant was "tripping hard" at the time of shooting, including his reason for having the "bladed" knife in his car. The knife evidence also tended to

---

17    The court instructed the jury with CALCRIM No. 303 in part as follows: "During the trial, certain evidence was admitted for a limited purpose. You may consider that evidence only for that purpose and for no other."

show defendant had, at his disposal, weapons other than a high-powered semi-automatic gun, which, if believed, he could have used to "defend" himself and/or his family members from "harm" by the truck's occupants.

In addition, while probative, the knife evidence was not substantially outweighed by the probability its admission would create substantial danger of undue prejudice. (Evid. Code, § 352.) Indeed, as we have noted, defendant himself disclosed the presence of the "bladed knife" in the Chevy. And of course, he also admitted firing multiple rounds into the side of the truck, and using his car to ram the truck as he chased after it during rush-hour traffic.

In our view, defendant's possession of two knives in the Chevy, in light of the evidence of the charged offenses, reduced, if not eliminated, any potential prejudice arising from the admission of the uncharged knife evidence. (See *People v. Eubanks* (2011) 53 Cal.4th 110, 144 [noting that the potential prejudice for purposes of Evidence Code section 352 "is 'decreased' when testimony describing the defendant's uncharged acts is 'no stronger and no more inflammatory than the testimony concerning the charged offenses' "].)

Finally, any error in admitting the knife evidence was harmless under either test for prejudicial error in light of the overwhelming evidence of defendant's guilt, as we have discussed. (See *Chapman, supra,* 386 U.S. at p. 24; *Watson, supra,* 46 Cal.2d at p. 836.) For these reasons, we reject this claim of error.

G. *Sufficiency of the Evidence*

Defendant next contends the evidence was insufficient to support his conviction on count 5 for assault with a deadly weapon other than a firearm. (§ 245, subd. (a)(1).) Specifically, defendant contends his repeated acts of ramming his car into the truck as he was chasing it during rush-hour traffic

45

was not likely to result in the application of force to the truck's occupants. We reject this contention and conclude it too borders on the frivolous.

" 'As used in section 245, subdivision (a)(1), a "deadly weapon" is "any object, instrument, or weapon which is used in such a manner as to be capable of producing and likely to produce, death or great bodily injury." ' [Citation.] . . . 'In determining whether an object not inherently deadly or dangerous is used as such, the trier of fact may consider the nature of the object, the manner in which it is used, and all other facts relevant to the issue.' [Citation.]" (*In re B.M.* (2018) 6 Cal.5th 528, 532–533 (*B.M.*).)

In *B.M.*, *supra*, 6 Cal.5th 528, our high court clarified the law concerning assault with a deadly weapon. There, the minor defendant made slicing motions at her sister's blanket-covered legs using a butter knife, applying insufficient pressure to pierce the blanket or cause serious bodily injury. (*Id.* at p. 531.) In finding this evidence insufficient to support a finding the minor used the butter knife as a "deadly weapon," the *B.M.* court clarified the law concerning assault with a deadly weapon, articulating three principles.

"First, the object alleged to be a deadly weapon must be used in a manner that is not only 'capable of producing' but also ' "likely to produce death or great bodily injury." ' [Citation.]" (*B.M.*, *supra*, 6 Cal.5th at p. 533, italics omitted.) Second, whether the object is a deadly weapon "must rest on evidence of how the defendant actually 'used' the object[,]" and not "conjecture as to how the object could have been used." (*Id.* at p. 534.) "Third, although it is appropriate to consider the injury that could have resulted from the way the object was used, the extent of actual injury or lack of injury is also relevant. '[A] conviction for assault with a deadly weapon does not require proof of an injury or even physical contact' [citation], but

46

limited injury or lack of injury may suggest that the nature of the object or the way it was used was not capable of producing or likely to produce death or serious harm." (*Id.* at p. 535.)

Here, the car defendant used as a deadly weapon was nothing like the butter knife used by the minor in *B.M.*. The undisputed evidence shows defendant drove the Chevy in such a manner that it was "not only 'capable of producing' but also ' "likely to produce death or great bodily injury," ' " as he chased the truck down several busy streets. (See *B.M.*, *supra*, 6 Cal.5th at p. 533, italics omitted.) In addition, the evidence shows defendant "actually 'used' " the Chevy as a deadly weapon (see *id.* at p. 534), as he repeatedly rammed his car into the truck in an attempt to "disable" the truck and keep it from leaving the area.

Moreover, although the truck's occupants were shaken, the record evidence supports the finding they could have been injured in light of the number of times defendant rammed his car into the truck, at one point causing the Chevy to become "stuck" and dragged down the street by the truck. (See *B.M.*, *supra*, 6 Cal.5th at p. 535 [noting a conviction for assault with a deadly weapon does not require proof of an injury or even physical contact].)[18]

---

[18] Defendant contends that considered together, the various errors denied him a fair trial (despite his statements during trial acknowledging he had received a fair trial, as noted *ante*). Under the cumulative error doctrine, the effect of several trial errors may be prejudicial even if they would not be prejudicial when considered individually. (See *People v. Sanchez* (1995) 12 Cal.4th 1, 60, overruled in part on another ground as stated in *People v. Doolin* (2009) 45 Cal.4th 390, 421.) Here, we have found that no trial errors occurred, or that any such errors, if they occurred, were harmless and not collectively prejudicial. (See *People v. Lua* (2017) 10 Cal.App.5th 1004, 1019.) As such, we reject this claim of error.

H. *Prior Prison-Term Enhancements*

As noted *ante*, the information against defendant alleged he had served five prior prison terms (see §§ 667.5, subd. (b) & 668) for the following offenses:  obstructing or resisting an executive officer in the performance of his or her duties (§ 69); carrying a concealed dirk or dagger (§ 21310); violation of a protective order (§ 273.6, subd. (a)); destruction of prison property (§ 4600); willful infliction of corporal injury (§ 273.5, subd. (a)); and possession of a controlled substance (Health & Saf. Code, § 11377, subd. (a)).

Effective January 1, 2020, the one-year enhancement provided for in section 667.5, subdivision (b) was inapplicable to all prior prison terms except those served for a sexually violent offense within the meaning of Welfare and Institutions Code section 6600, subdivision (b).

We find, as do the parties, that the provisions of Senate Bill No. 136 (Stats. 2019, ch. 590) apply retroactively to those cases that were not final as of the effective date of the statute (*In re Estrada* (1965) 63 Cal.2d 740; *People v. Jennings* (2019) 42 Cal.App.5th 664, 682); and that the convictions in the instant case were not final prior to this date.  (*People v. Vieira* (2005) 35 Cal.4th 264, 306.)  As such, we agree with the parties that defendant is entitled to the benefit of the change in the law, as none of his prison priors qualify for the enhancement under newly amended section 667.5, subdivision (b).

## DISPOSITION

Defendant's sentence is modified to strike his prison prior enhancements.  (See § 667.5, subd. (b).)  The trial court is directed to amend the abstract of judgment accordingly and to forward it to the Department of Corrections and Rehabilitation.  In all other respects the judgment is affirmed.

BENKE, Acting P. J.

WE CONCUR:


AARON, J.


GUERRERO, J.